## WILLIAM SHERMAN v. CHARLES R. STORY.

MANNER OF TRYING THE CORRECTNESS OR EXISTENCE OF A STATUTE. —If it is claimed that a statute is not correctly published, or if the fact of its passage is denied, the question is to be tried and determined by the Court as one of law, and cannot be put in issue and tried as one of fact.

AN ENROLLED STATUTE CONCLUSIVE OF ITS EXISTENCE.—An Act of the Legislature, properly enrolled, authenticated and deposited with the Secretary of State, is a record which is conclusive evidence of the passage of the Act, and that the Act passed as enrolled.

EVIDENCE IMPEACHING AN ENROLLED STATUTE.—Neither the Journals of the Legislature, nor the bill as originally introduced, nor the amendments attached to it, nor parol evidence, can be received in order to show that an Act of the Legislature, properly enrolled, authenticated and deposited with the Secretary of State, either did not become a law in accordance with the prescribed forms, or did not become a law as enrolled.

*Fowler* v. *Pierce*, 2 Cal. 165, commented on.

APPEAL from the District Court, Fourth Judicial District, City and County of San Francisco.

In 1862 the Legislature passed an Act compelling every male inhabitant of the State over twenty-one years of age to pay a military poll tax of two dollars. In 1866 an Act was passed entitled " An Act concerning the military of the State

of California," which in its last section repealed the Act of 1862.

The defendant in 1866 was Tax Collector of the City and County of San Francisco, and demanded of the plaintiff his military poll tax, which the plaintiff refused to pay, and the defendant thereupon levied on his goods and threatened to sell them to satisfy the tax and costs. Plaintiff filed a bill in equity to enjoin the sale, relying on the repealing clause in the Act of 1866. Defendant set up in his answer that the Act of 1866 was null and void, because after the Act had passed the Senate it was transmitted to the Assembly, where several amendments were proposed, which were rejected, and the Act was then returned to the Senate with the amendments attached, and was enrolled in the Senate with the proposed amendments included, notwithstanding they had been rejected in the House, and was thus signed by the Governor. The Court below gave judgment for plaintiff, and the defendant appealed.

The other facts are stated in the opinion of the Court.

*W. C. Burnett*, for Appellant, argued that as the bill as enrolled and signed by the Governor contained the amendments which had been rejected by the House, it was not the bill which had passed the Legislature, and was not, therefore, a law.

*James McCabe*, for Respondent, argued that the fact that the bill was enrolled and properly authenticated by the officers of both branches of the Legislature, and signed by the Governor and deposited with the Secretary of State, was conclusive that all proceedings necessary to the passage of the bill as enrolled were regular, and that it did pass as enrolled.

By the Court, Sawyer, J.:

The question in this case, is, whether "An Act concerning the military of the State of California," approved April 2, 1866, was ever legally passed by the two Houses so as to

become a valid law. The Journals show that the bill originated in the Senate, and was entitled "Substitute Senate Bill No. 56;" that, having passed that body, it was transmitted to the Assembly, where it was referred to the Committee on Military Affairs; that said committee reported it back to the Assembly, with amendments, and recommended its passage, as thus amended; that the amendments were rejected, and that the bill was then read a third time and passed. The Journal does not show either the contents of the bill as it came from the Senate, or the amendments thus proposed and rejected. After its passage in the Assembly the bill was enrolled by the Enrolling Clerk of the Senate and reported to that body as correctly enrolled. Upon the bill as enrolled is indorsed the certificate of the Assistant Secretary of the Senate, that it passed the Senate March 20, 1866, and of the Clerk of the Assembly, that it passed that body March 29, 1866. It is also signed by the President *pro tem* of the Senate and the Speaker of the Assembly, and has the approval of the Governor. This is the enrolled Act, as it now appears in the office of the Secretary of State—the legal custodian of the record. There is nothing upon the face of the Act as enrolled and now remaining of record in the office of the Secretary of State, nor is there anything in the Journal, showing that it is not enrolled and approved in precisely the same form as that in which it passed both Houses. To impeach the validity of the Act, the defendant introduced in evidence the bill as it was transmitted from the Senate to the Assembly; the amendments said to have been proposed by the Committee of the Assembly on Military Affairs, as they appear on the tags annexed to the Senate bill; also, oral testimony, for the purpose of showing that the said amendments, as they appear on said tags, are the amendments proposed by said committee and rejected; and that said rejected amendments were incorporated into the enrolled bill by the Enrolling Clerk of the Senate, and thereby, although in fact not adopted by either House, became a part of the Act, as it now appears. In other words, it is claimed to be competent to show, by the kind of evidence indicated,

that the Act now appearing of record in the office of the Secretary of State, duly authenticated by the certificates of the Secretary of the Senate and Clerk of the Assembly, the signatures of the President of the Senate and Speaker of the Assembly, and the approval of the Governor of the State, never did pass either House, and is, therefore, not a valid law.

The question involved is one of vast practical consequence.

Is it admissible to go behind the duly authenticated enrolled Act, and examine the Journals of the Senate and Assembly for the purpose of impeaching the validity of the Act? And if it is admissible to inspect the Journals for that purpose, is it also admissible to go behind the Journals and receive other evidence of a still more fugitive and less reliable character, documentary and parol?

These are the precise questions to be determined.

At common law, the only mode of trying the existence of a record, was, by the record itself, upon a plea of *nul tiel record* —that there is no such matter of record existing. Upon such an issue the record itself is the only evidence, and it is conclusive. Blackstone says : " The trial, therefore, of this issue —*nul tiel record*—is merely by the record ; for, as Sir Edward Coke observes, a record or enrolment is a monument of so high a nature, and importeth in itself such absolute verity, that if it be pleaded that there is no such record it shall not receive any trial by witness, jury or otherwise, but only by itself." (3 Black. Com. 331.) The evidence of the Acts of Parliament, or of the Legislature, which are made matters of record, must be the record of those Acts, as much so as the records of Courts of justice.

In England " general Acts are always enrolled by the Clerk of the Parliament and delivered over into the chancery—which enrolment in the chancery makes them the original record "— but as to private Acts, the bill itself, filed and sealed and remaining with the Clerk of the Parliament, is the original record. (*King* v. *Arundel*, Hobart, 249 [110.]) It was not customary to enroll private Acts except upon suit for that purpose. When enrolled the enrolled Act itself was the original record and the

record was conclusive. It could not be aided or affected by the Journals. There was in fact no Journal kept by the House of Commons till the time of E. 6: (Ib. 109.) In the case cited it is said upon the question of explaining the record of an Act of Parliament by the aid of the Journals: " But now suppose that the Journals were in every way full and perfect, yet it hath no power to satisfy, destroy or weaken the Act, which being a high record must be tried by itself, *teste meipso.* Now Journals are no records, but remembrances for forms of proceedings to the record; they are not of necessity—neither have they always been. They are like dockets of prothonotaries, or the particular to the King's patent. * * * The Journal is of good use for the observation of the generality and materiality of proceedings and deliberations as to the three readings of any bill, the intercourses between the two Houses and the like; but when the Act is passed the Journal is expired. And in *this Journal* there appears *but one reading* of the bill in the upper House when it passed, *which is unlikely.* But if the record of the Act itself carry its death's wound in itself, then, it is true, that the parchment—no, nor the great seal, either to the original Act or to the exemplification of it— will not serve as in the 4 H. 7, 18, where the Act was by the King, with the consent of the Lords (omitting the Commons,) and was judged therefore void. And he that observes the case 33 H. 9, 17, which was the only case relied upon by the defendant's counsel, shall find it so; and upon this rule the doubt to be conceived, namely, upon the Parliament roll itself, not upon the Journal." (Hob. 110, 111.)

In this State the practice is to enroll all Acts, both general and private. The enrolment may not be performed in precisely the same manner as in the case of Acts of Parliament, but it has the same purpose and effect. With us, perhaps, the enrolled Act is both the original Act and the enrolment, for it is enrolled before attested, and the attestation is on the enrolled Act itself. The regular course of proceedings is, after all amendments proposed to a bill have been acted upon,

33

to engross the bill as amended. After engrossment it is put
upon its final passage. After it has passed both Houses it is
enrolled by the Enrolling Clerk of the House in which it
originated. After enrolment it is passed to the Committee on
Enrolment of that House, and, upon their report that it is
correctly enrolled, the Act thus enrolled has indorsed upon it
the date of its passage through their respective Houses, certi-
fied by the Secretary of the Senate and Clerk of the Assem-
bly. It is then signed by the President of the Senate and
Speaker of the House, approved by the Governor and depos-
ited with the Secretary of State, whose duty it is to retain
the "custody of and carefully preserve  *  *  *  the manu-
script containing the enrolled Acts and joint resolutions  *  *
of the Legislature." (Laws 1854, p. 117, Sec. 4.) The enrolled
Act, thus authenticated and deposited in the office of the Sec-
retary of State, must be regarded as the record, and as "a
monument of" as "high a nature" and solemn character as
an Act of Parliament enrolled in chancery, or as a record in a
Court of justice, unless there is something in our Constitution
or laws detracting from its dignity, or authorizing its impeach-
ment. We have not been referred to any provision of the
Constitution, or of the statute—and we know of none—
which in any degree impairs the dignity of this solemn record,
or modifies the principles of the common law applicable to it.
But it may be well to notice the observations of Judges in
the decisions of other States, to show that in no instance in
the older States has the common law been departed from to
the extent required to annul the statute under consideration.
At common law not even the plea of *nul tiel record* was
admissible. There was no plea by which the existence of a
general Act of Parliament, as a question of fact, could be put
in issue and tried. It was regarded as a question of law alone,
of which the Judges were bound to take notice. If the enrol-
ment was in existence they would consult, but, of course,
would not go beyond that record. But if that had been lost
or destroyed, and there was no printed statute, it was neces-
sary for the Judges to look for it in other documents where it

had been recited or recognized and acted upon, or to inform themselves in the best mode they could. It was still a question of law, and not of fact, and they were supposed to know the law. Thus in the Prince's case, (8 Coke, 28,) "It was resolved that against a general Act of Parliament, or such Act whereof the Judges *ex officio* ought to take notice, the other party cannot plead *nul tiel record*; for of such Acts the Judges ought to take notice; but if it be misrecited the party ought to demur in law upon it. And, in that case, the law is grounded upon great reason; for, God forbid, if the record of such Acts should be lost or consumed by fire, or other means, that it should tend to the general prejudice of the commonwealth; but rather, although it be lost or consumed, the Judges, either by the printed copy, or by the record in which it was pleaded, or by other means, may inform themselves of it." (See, also, Dwarris on Statutes, p. 613.)

In New York the question as to whether an Act of the Legislature had been passed by a two thirds vote, as required by the Constitution, was regarded by several Judges of the Court for the correction of errors, as properly presented by demurrer. That is to say, that it is a question of law for the Court, and not a question of fact for the jury. (*People* v. *Purdy*, 2 Hill, 35; *People* v. *De Bow*, 1 Den. 14; *Warner* v. *Beers*, 23 Wend. 131—per Verplanck, Ib. 170—per Bradish Pres. Sen.; *People* v. *Purdy*, 4 Hill, 394—per Paige, Ib. 404— per Franklin.) The decisions in these cases all arose upon demurrer to the pleadings or instructions to the jury. While the Judges in New York were subsequently unable to agree among themselves as to what precise points were decided in these several cases (see opinions of the Chancellor in *Gifford* v. *Livingston*, 2 Denio, 383, and Senator Hand, Ib. 389; opinion of Mr. Chief Justice Bronson, in *De Bow* v. *People*, 1 Den. 17; and opinion of Mr. Justice Cowen, in *Hunt* v. *Van Alstyne*, 25 Wend. 612,) it is clear, that, regarding the question either as one of law to be determined by the Court, or of fact for the jury, they did not decide it to be competent to impeach the verity of an Act properly authenticated and enrolled by

parol testimony, or documentary evidence showing the action of the two Houses prior to such enrolment. Nor did any one intimate—unless Senators Franklin and Verplanck may be considered exceptions—that it would be admissible to go behind the Act authenticated in the proper manner. The question was alluded to in *People* v. *Purdy*, 2 Hill, 34. But in this case, and in the other cases cited from our sister States, the question and the decision thereon arose under constitutional and statutory provisions, which to a greater or less extent affected the decisions. The Constitution of New York required in express terms a certain class of Acts to be passed by a vote of two thirds of all the members of each House. The question was raised on demurrer whether the Act in question received the required vote. And the question discussed was, whether the judicial tribunals under the constitutional and statutory provisions in force could go behind the "printed statute book," for the purpose of ascertaining whether the law had received the requisite vote. Mr. Justice Bronson said : " I have felt a good deal of difficulty on that question. * * The question is no doubt one of great delicacy. * * To give efficacy to this provision (of the Constitution) and secure the people against the exercise of powers which they have not granted, we must, I think, when called on to do so, look behind the printed statute book and inquire whether bills creating or altering corporations have received the requisite number of votes." For the purpose of giving effect to an express constitutional provision—a consideration which seems to have had weight in the mind of Mr. Justice Bronson—he felt called upon to look behind the " printed statute book ;" but to what did he look ? The next paragraph shows how far he proposed to carry the investigation, and that is to the enrolled Act, and the certificates of the presiding officers—the " engrossed bill," as he calls it, but it is evidently the same as our enrolled Act, for it is the one certified by the proper officers, signed by the Governor, and on file in the office of the Secretary of State. (See Rev. St. N. Y., Part 1, Chap. VII, Tit. IV, Secs. 3, 4, 10.) It is, therefore, the actual record of

the Act. The term " engrossed bill " is evidently used in a similar sense by the same Judge in the case of *De Bow* v. *The People*, to be cited. He says in *People* v. *Purdy*, (p. 35) : " It is also enacted that ' *no bill shall be deemed to have been passed* by the assent of two thirds of the members elected to each House, *unless so certified* by the presiding officer of each House.' (1 R. S., p. 156, Sec. 3.) *To give full effect to this enactment, and provide a convenient mode of ascertaining whether the two thirds clause in the Constitution has been duly observed, the laws should be published with all the usual evidences of their authenticity. The certificates of the presiding officers of the two Houses, and the approval of the Governor, should be published as well as the body of the law.* But as such has not been the practice, I have examined the original engrossed bill on file in the Secretary's office, and find that the Act of 1840 *is only certified* by the presiding officers *in the usual form of certifying majority bills.* If this be not conclusive, it is at least *prima facie* evidence ; and *following the statute this bill cannot be deemed to have been passed by the assent of two thirds of the members elected to each House.*"

All that is here said is, in effect, that, as the statute expressly provides that " no bill *shall be deemed* to have passed by the assent of two thirds of the members elected to each House *unless so certified* by the presiding officer of each House," and as these certificates are not printed in the statutes, I will look behind the " printed statute book " to the enrolled bill—the Act itself, the original record—and see if the bill is so certified, and if I find from the record that it is not so certified, I will take that as record evidence that the bill did not pass by the requisite number of votes. *That is to say, I will determine the question by an inspection of the record itself, instead of the statute as printed.* He thinks—and so does the Chief Justice in *Hunt* v. *Van Alstyne*, 25 Wend. 609—that the certificates of the presiding officers and the approval of the Governor, as they appear upon the record itself, as well as the body of the Act, should have been printed in the statute book. Had it been so printed, the necessity of looking behind the statute

book to the record itself would have been obviated.   And so would the difficulty of President Bradish as to the right to go behind the printed statute book, suggested in a case which will be cited.   There is no intimation that it would be admissible to carry the investigation further, and he regards it as a matter of doubt and delicacy whether it should be carried to this extent.   But the other Judges do not distinctly allude to the matter, although Mr. Justice Cowen seems to be of the same opinion, (p. 45,) and the case is decided upon other grounds.

The case went to the Court for the correction of errors. The Chancellor (Walworth,) without inquiring how the question as to whether the Act was passed by a sufficient number of votes is to be determined—that is, as a question of law or fact—took the view of the question expressed by Mr. Justice Bronson, in the Supreme Court, viz : that it was proper to go behind the printed statute book (which is printed on the certificate of the Secretary of State,) and look to the original record—the enrolled bill and certificate of the presiding officer of each House thereto appended.   He says (4 Hill, 390 :) " The Legislature has declared by law that no bill shall be deemed to have passed by a two thirds vote unless it is so certified by the presiding officer of each House.   And I am inclined to the opinion that such a certificate, rather than the certificate of the Secretary of State, specifying the time when the law was passed, is to be considered the only legal evidence that the bill was in fact passed with the assent of two thirds of all the members elected to each branch of the Legislature." There is no intimation that it is admissible to go behind the record ; but to the contrary, for he thinks it " is to be considered the only legal evidence that the bill has in fact passed," etc.

Senator Paige expresses a similar view, and holds that it must be determined as a question of law.   He says (p. 394 :) " Judges, who are bound to take notice of a public act, must determine this question by an inspection of the record ; for *nul tiel record* cannot be pleaded to a statute."   He also says

that Mr. Justice Bronson came to the same conclusion in the Supreme Court. Senator Franklin takes a similar view, regarding the question also as one of law to be determined by the " Judges, who are to inform themselves in the best way they can," (p. 404.) He also refers to the Journal as *sustaining* the record as certified by the presiding officers of the two Houses. But there does not appear to have been any question relating to the Journals. These are the only members of the Court who alluded to the question. The judgment of the Supreme Court was reversed.

In *Warner* v. *Beers*, and *Bolander* v. *Stevens*, 23 Wend. 103, which are prior in time in the Court of Errors to the case of *People* v. *Purdy*, the question was also discussed. The question was distinctly raised as a question of law by demurrer (p. 108.) The point was made in briefs of counsel and authorities cited. The Chancellor says he has very little doubt that the Court is not authorized upon this demurrer to the plaintiff's declaration to look beyond the " printed statute book" to ascertain whether the law was passed by a two-thirds vote [in this he was overruled in *People* v. *Purdy;* see opinion of Mr. Chief Justice Bronson, 1 Den. 14,] but he does seem to doubt " if a Court is authorized in any way to institute an inquiry into the mode in which a law signed by a Governor, and duly certified by the Secretary of State, was passed." (P. 125, and note to *Bolander* v. *Stevens*, bottom p. 104.) He, however, expresses no opinion. Senator Verplanck, in a vigorous opinion, maintains that the question as to whether the Act in question was passed by a competent vote is properly presented by demurrer (p. 132.) He says (p. 133): " But all our authorities are strong that, ' as Judges are bound to take notice of a general law, so it is their province to determine whether it be a statute or not.' (Dwar. on Stat., Sec. 6, 30.) The same author adds : ' that the rule depends ndt on conjectural expediency, but positive law. Accordingly, the existence of a public Act must be tried by the Judges, who are to inform themselves in the best way they can.' When we consider, too, that the rights, interests, property

and peace of a large majority of citizens must rest, more or less, upon the presumed validity of enactments of statutes authenticated in the forms of law, and subject only to judicial revision as to their constitutional character, we cannot but see the imperious necessity of having some stable rule which should prevent the authority of every law being left to depend upon the verdict of a jury, on the accidental evidence before them. I hold accordingly that the doctrine that 'against a general statute *nul tiel record* cannot be pleaded,' expresses, with the weight of old and learned authority, and in antique and artificial language, a sound rule of wise general policy."

Again (p. 135): "The official printed volumes of the Acts are the usual and authentic evidence to the Court of the statute law. Should it happen that some egregious error of the press, as has been known to occur, had distorted the sense of the statute, the Courts might, in their discretion, resort to other and still better authority, and correct the printed copy by the original statute itself. They could do this on every principle of common sense; besides which, the 'inspection of the record,' when judged necessary, has the sanction of the most venerable authorities and oldest usage of our common law. See the ancient cases (Dyer, 93; 8 Cooke R. 28) collected by the learned research of Mr. Noyes in his able argument of this branch of the case. So in later times; before Mr. Chief Justice Pratt, (1 Strange, 446, and Lord Mansfield, 3 Burr R. 1,472) the original Parliament rolls were examined to correct the printed books. If, then, the original Act, or the duly certified copy of it, could be read at bar to ascertain the true manuscript reading of the Act, why not for any other purpose, and especially to determine whether the bill shall be judicially 'deemed' to have been passed by a constitutional authority?" And again (p. 137:) "These considerations and authorities lead my mind to the undoubting conviction that this Court, as well as the Court below, is bound, whenever such a question is presented, to use the authority of known, uncontradicted and acknowledged history; and if necessary of the printed records and Journals, and, if

need yet be, of actual inspection of the original certified Acts themselves, not as testimony, to disputed facts, but as the best authorities for the true meaning and right constitutional character of any statute that may be brought under consideration."

Mr. Bradish, President of the Senate, in a very lucid and able opinion, maintains that the statutes, as certified by the Secretary of State—the printed Acts—under the statute of New York, are conclusive, and that it is inadmissible to go behind them. He says, upon any other hypothesis, "that certainty as to what the law is, which is so important to all, and which it has been the object of the statute to establish, would be at once destroyed, and everything thrown into doubt.  *  *  *  This interpretation once admitted, it would be as difficult to limit these inquiries as it would to calculate their inconvenience or compute their mischiefs. But what would be only difficulties within our State, would be impossibilities out of it." (169– 170.) What shall we say, then, to going behind the enrolled Act itself, the record of the Act?

But conceding the propriety of going beyond the printed statute to ascertain whether the law has been passed by the requisite number of votes, in what mode shall the inquiry be made? In discussing this point he says : The Act " is therefore a public Act ; and having received the requisite legal sanctions, and been deposited in the office of the Secretary of State, it has become a public record. I am, therefore, clearly of opinion that the question whether this Act of the Legislature be a law is not a question of fact to be tried by a jury, but one of law, to be determined by the Court only, and that by an inspection of the record. That record imports verity. Its truth cannot be determined by a proceeding *in pais*, but must be decided by itself on inspection. This opinion rests upon the highest authorities, both ancient and modern. The precedents are numerous and conclusive that at common law the validity of a public act cannot be put in issue by a plea. A man cannot plead ' *nul tiel record* ' to a public statute. Even in one of the most remarkable cases in the English books it

34

was held unanimously by the most distinguished legal lights of that day that ' against a general Act of Parliament, or such an Act whereof the Judges ought, *ex officio*, to take notice, *nul tiel record* cannot be pleaded ;' and an Act of Parliament became necessary to remove the evil sought to be remedied by the proceedings in that case. This doctrine, unless necessarily modified by the revised statutes, is as sound and salutary here as elsewhere. A contrary doctrine, indeed, would seem to be fraught with equal absurdity and mischief. A proceeding *in pais*, if admitted, might extend to the investigation of even the purity of the Acts of the Legislature, and to the constitutional rights and official conduct of its members. The idea of thus putting on trial before a jury the official conduct of members of the Legislature in a mere collateral proceeding, in which they are in no respect parties and are wholly unheard, is in itself monstrous, and would be equally a violation of their constitutional rights, as it would be of the plainest dictates of justice. The very difficulties, not to say mischiefs, of such an investigation, in whatever form it may be pursued, constitute so many arguments in favor of the other rule, viz: that of considering the certificate of the Secretary of State conclusive, and of allowing no inquiry beyond it. This would be giving to that certificate and to the statute book the character which the Legislature clearly intended. This rule would be as convenient in practice as it would seem to be sound in theory. It would leave our Courts to judge of the constitutionality or unconstitutionality of an Act of the Legislature solely by its own provisions, as they appear upon the face of the Act itself, unembarrassed by any preliminary inquiry as to the manner in which or the votes by which it had passed." No other member of the Court discussed the question.

Again, in *Hunt* v. *Van Alstyne*, 25 Wend. 606, the question was raised by plea and demurrer to the plea. Mr. Chief Justice Nelson says (p. 610): " If material to determine the validity of the law within the two-thirds provision in the Constitution, or within any of the sections of the revised statutes regulating the mode of the enactment of laws, they

can still be brought to our notice, doubtless, by an exemplified copy of the original on file. Until this is done, we do not look beyond the statute as published by the requisite authority, and shall assume each there found to be constitutionally enacted. In the case before us, assuming the special pleas constitute a valid defense to the action, if true, under the test given in section three (1 R. S. 143), which declares that no bill shall be deemed to have been passed by the assent of two thirds unless so certified by the presiding officer of each House, an exemplified copy of the general banking law might determine the fact involved in them. If, on its production, no such certificate appeared, the Court would be bound to regard it as passed by a majority only. But suppose it did appear, would it be conclusive? It seems to me it would be so. There are only two modes of contradicting it: 1. By the Journals of the two Houses; and 2. By parol testimony. The presiding officer had all the benefit of the first—the ayes and noes were taken and the Journals made up under his supervision and control. His means of ascertaining and determining the fact, when he declares the law to be passed, exceed those of any other tribunal that might afterward be called upon to inquire into it. Besides, the hurry and looseness with which the Journals are copied, and the little importance attached to the printed copies, necessarily impair confidence in their correctness. They are most uncertain data upon which to found a judicial determination of the rights of property, much more of great constitutional questions. As to the second mode of contradicting the certificates, the evidence would, if possible, be still more fallible and unsatisfactory. Indeed, we can scarcely imagine a case where, from its nature, the proof would be so subject to the doubtful and conflicting recollection of witnesses. Nothing short of absolute necessity could justify a resort to it. It would hardly deserve weight in contradicting the Journal itself, much less the certificate of the presiding officer affixed to the law." But he reserves himself on this point as the case went off on other grounds, and neither of the other Justices allude to it.

In *De Bow* v. *The People*, 1 Den. 14, Mr. Chief Justice Bronson, referring to *People* v. *Purdy*, 4 Hill, 384, says : " It is now settled that it is the business of the Court to determine what is statute, as well as what is common law, and for that purpose the Judges may and should, if necessary, look beyond the statute book, and examine the original engrossed bills on file in the office of the Secretary of State ; and it seems that the Journal kept by the two Houses may also be consulted." There is nothing, however, in any of the cases to justify the suggestion in regard to the Journals except the allusion to them by Senators Franklin and Verplanck before noticed (4 Hill, 405,) and they referred to them as *sustaining* and *not overthrowing* the record. If the Chief Justice is right as to what was determined, the question is one of law for the Court and not of fact for the jury, to be determined like any other question of law, for it was raised on demurrer to an information in the nature of a *quo warranto*, wherein the relator relied upon a law altering the charter of New York City which had not been certified as having passed by a two thirds vote. But the Court only looked beyond the " printed statute book " to the original Act certified and on file in the office of the Secretary of State—the actual record.

Thus stand the discussions in the Courts of New York, and the utmost extent to which the points decided can be said to go is, that the question is one of law for the Court, and that the Court may look behind the printed statute to the enrolled Act itself—to the record. In the several cases the records themselves were not authenticated in the mode required, to show that the several Acts had received the votes of two thirds of all the members of each House, and they carried upon their face the evidence of the invalidity of the Acts. In the language of Hobart, the " record of the Act itself carried its death's wound in itself, and neither the parchment nor the great seal " could save it. But the implications from the discussions of all the members of the several Courts who alluded to the question, go strongly to sustain the position that the question is one of law ; but, whether it is to be determined as

one of law, or fact, the rule is, unless modified by some express
constitutional or statutory provision, that the solemn record
of the Act, as it is enrolled and authenticated on file in the
office of the Secretary of State, cannot be impeached by
showing defects and irregularities in the proceedings while
pending before the Legislature.  And they show in forcible
language, which we adopt, the inconvenience and mischief
which would necessarily flow from the adoption of any other
rule.

In the case of *Burr et al.* v. *Ross et al.*, 19 Ark. 250, the
Supreme Court of Arkansas were, upon the argument, referred
to a statute as sustaining the action of the Court below in
allowing an amendment.  In consequence of a doubt as to
whether the Act had ever passed, raised by the certificates of
the Secretary of State, Clerk and Speaker of the House of
Representatives published with the Act, the Judges, as it
would seem, on their own motion, looked into the Journal for
the purpose of determining the question, and found by the·
Journal that the bill was indefinitely postponed in the House
and had never passed.  This was of course determined as a
question of law and not of fact.  There does not seem to
have been any objection made to the Court's adopting this
mode of informing itself, nor does the question appear to have
been in any way discussed.  Upon looking at the statute
(Laws of Arkansas, 1856–7, p. 185), it will be seen by the
certificate of the Secretary of State, that there was deposited
in his office with the Act itself a certificate (of the same date
with the Act) of the Clerk of the House of Representatives,
that the bill was " indefinitely postponed" by the House, fol-
lowed by the certificate of the Speaker of the House of Rep-
resentatives that the foregoing statement of the Clerk is
correct, and that " from mistake the said bill has been en-
grossed and signed by the Speaker of the House of Represen-
tatives, and the President of the Senate," and approved by the
Governor.  These certificates of the Clerk and Speaker, then,
going into the office of the Secretary with the Act, forming
a part of the record itself, seem to have been regarded by the

Court as neutralizing, so to speak, the signatures of the same officers to the Act, thereby rendering the record itself unsatisfactory evidence of the passage of the bill. Whether the action of the Court was right or wrong, the most that can be said of it is, that the Court looked into the Journals for the purpose of dispelling, by its aid, a doubt raised by an equivocal record. The record, in a measure, carried its death wound within itself. There was a certificate that it had, and one that it had not passed.

In *Spangler* v. *Jacoby*, 14 Ill. 298, under the Constitution of Illinois, which required that "each House shall keep a journal of its proceedings," that "on the final passage of all bills, the vote shall be by ayes and noes and shall be entered on the Journal, and no bill shall become a law without the concurrence of a majority of all the members elect in each House," it was held by two Justices, the third being absent, that, to render an Act valid, "it must appear on the face of the Journal that the bill passed by a constitutional majority;" and that "it is competent to show from the Journals of either branch of the Legislature that a particular Act was not passed in the mode prescribed by the Constitution, and thus defeat its operation altogether. (14 Ill. 299.)

But this ruling was expressly based upon the very special provision of the Constitution of that State. The Court say (p. 299): "A majority of the members elected to either branch of the General Assembly must concur in the final passage of a bill. This is indispensable to its becoming a law. Without it, the Act has no more force than the paper upon which it is written. The vote must be taken by ayes and noes. The Constitution prescribes this as the test by which to determine whether the requisite number of members vote in the affirmative. The vote must also be entered on the Journal. The office of the Journal is to record the proceedings of the House, and authenticate and preserve the same. It must appear on the face of the Journal that the bill passed by a constitutional majority. These directions are clearly imperative. They are expressly enjoined by the funda-

mental law, and cannot be dispensed with by the Legislature. The Constitution requires each House to keep a journal, and declares that certain facts, made essential to the passage of a law, shall be stated therein. If those facts are not set forth, the conclusion is that they did not transpire. The Journal is made up under the immediate direction of the House, and is presumed to contain a full and complete history of its proceedings. If a certain Act received the constitutional assent of the body, it will so appear on the face of its Journal. And when a contest arises as to whether the Act was thus passed, the Journal may be appealed to to settle it. It is the evidence of the action of the House, and by it the Act must stand or fall. It certainly was not the intention of the framers of the Constitution that the signatures of the Speakers and the Executive should furnish conclusive evidence of the passage of a law. The presumption, indeed, is that an Act thus verified became a law pursuant to the requirements of the Constitution; but that presumption may be overthrown. If the Journal is lost or destroyed, this presumption will sustain the law, for it will be intended that the proper entry was made on the Journal. But when the Journal is in existence, and it fails to show that the Act was passed in the mode prescribed by the Constitution, the presumption is overcome, and the Act must fall."

Thus, it is held, that the constitutional provision modifies the rule of the common law, and to secure an enforcement of its provisions requires the vote to be by ayes and noes, and to be evidenced by entries in the Journals, and that these entries in the Journals are themselves a part of the mode of authentication prescribed, and a part of the record. But it is not proposed to carry the rule further than is prescribed, and look beyond the Journals, for it is said, " if the Journal is lost or destroyed this presumption (arising from the Act itself duly signed) will sustain the law, for it will be intended that the proper entry was made on the Journal."

In the *Pacific Railroad* v. *The Governor of Missouri*, 23 Mo. 353, it was held—Mr. Justice Leonard dissenting—that the

validity of an enrolled statute, authenticated in the manner pointed out by law, by the certificate of the presiding officers of the two Houses of Assembly, that it passed over the Governor's veto by the constitutional majority, cannot be impeached by the Journals showing a departure from the forms prescribed by the Constitution in the reconsideration of the bill. The opinion contains a spirited vindication of the common law rule, and presents in forcible language appropriate to the case now in hand the impolicy of permitting the final record of an Act to be impeached by the Journals of the Legislature. Mr. Justice Scott says (p. 362) : "If the Legislature exceeded its powers in the enactment of a law, the Courts, being sworn to support the Constitution, must judge the law by the standard of the Constitution and declare its validity. But the question, whether a law on its face violates the Constitution, is very different from that growing out of the non-compliance with the forms required to be observed in its enactment. In the one case, a power is exercised, not delegated, or which is prohibited, and the question of the validity of the law is determined from the language·of it. In the other, the law is not, in its terms, contrary to the Constitution ; on its face it is regular, but resort is had to something behind the law itself, in order to ascertain whether the General Assembly, in making the law, was governed by the rules prescribed for its action by the Constitution. This would seem like an inquisition into the conduct of the members of the General Assembly, and it must be seen at once that it is a very delicate power, the frequent exercise of which must lead to endless confusion in the administration of the law. This inquiry may be extended to good as well as to bad laws—to those passed as well with the approval of the Governor, as to those which are passed his objections to the contrary notwithstanding ; for it is clear that, if a law passed over the objections of the Governor may be impeached by inquiring whether the forms of the Constitution were observed in its enactment, the same inquiry may be instituted in relation to laws passed with his sanction ; and thus statutes, constitutional on their

face, regular in their terms, which may have been the rules of action for years, and under which large amounts of property have been vested, and numerous titles taken may be abrogated and declared void.    A principle with such a consequence should be supported by a weight of authority which no Court can resist.    When we reflect on the manner in which Journals are made up, and the rank of the officers to which that duty is intrusted, how startling must the proposition be that all our statute laws depend for their validity on the Journals of the two Houses of the General Assembly, showing that all the forms required by the Constitution to be observed in their enactment have been complied with.    The required forms may be observed, and the Clerks may fail to make the necessary or correct entry.    If the Journals had been designed as the evidence in the last resort that the laws were constitutionally passed, would not some method have been adopted by which greater care would have been exacted in entering the proceedings of the two Houses?    Would the task of making them have been intrusted to a single clerk, with a power in the Houses to dispense with their reading, even should there be a rule requiring them to be read—a matter, however, about which the Constitution and laws are silent?    In that country, from which we borrow so many of our ideas respecting government and laws, and whose common law and early statutes constitute the substratum of all our systems of jurisprudence, the statute roll is the only and exclusive evidence of what the statute law is, so long as it is in existence.    There it is maintained that if the Journal were every way full and perfect yet it hath no power to satisfy, destroy or weaken the Act, which, being a high record, must be tried only by itself—*teste meipso.* * * * So it appears by the common law the statute roll was the absolute and conclusive proof of a statute.    This record could not be contradicted.    It implied absolute verity. There was no plea by which the existence of a statute could be put in issue.    Under this state of the law our Constitution was adopted."    The learned Judge makes a very proper dis-

tinction between this case and the case of *Spangler* v. *Jacoby* before cited, and other cases cited.

In *Turley* v. *The County of Logan*, 17 Ill. 152, while the case of *Spangler* v. *Jacoby* is affirmed, it is expressly admitted that the case of *Pacific Railroad* v. *Governor of Missouri* is correctly determined. The Court say, in regard to the opinion in that case : " We have no doubt of the correctness of this opinion under their Constitution, and upon general principles, but the provisions of our Constitution are special, and may no more be disregarded than any other provision in it, restrictive of legislative power." (17 Ill. 153.) But in this case Mr. Justice Skinner, who was not a member of the Court when *Spangler* v. *Jacoby* was decided, expressly reserves himself upon the question of the impeachment of an Act, otherwise duly enrolled, by aid of the Journals, even under the Constitution of Illinois. This case also furnishes a striking illustration of the unreliability of the Journals of legislative bodies, and the impolicy of departing from the common law rule as to the absolute verity of records. A law had been passed by the Legislature of Illinois providing for a removal of the county seat of Logan County ; but it did not appear from the Journal that the Act had been read in the House the full number of times required by the Constitution, or that it had duly passed and become a law. Under the decision in *Spangler* v. *Jacoby*, it was, therefore, void, and a bill was filed on that ground, and an injunction obtained against the officers of the county restraining them from erecting county buildings at the new county seat. "Afterwards, in February, 1854, the same Legislature met in extra session, and, on recollection of members, and by the manuscript minutes of the Clerk of the House of Representatives, amended its Journal so. that it showed the bill or Act had been read the requisite number of times." At the next term of Court this amendment of the record was set up and the injunction dissolved, and the bill dismissed. The Court, on appeal, held, that it " was in the power of the same Legislature, at the same or a subsequent session, to correct its own Journals by amendments which show the true facts as

they actually occurred, when they are satisfied by neglect or design the truth had been omitted or suppressed." Thus, by the extraordinary accident of an extra session of the Legislature, the Act was saved, and a suit, which could have been maintained when it was commenced, was defeated by subsequent legislative action in correcting the blunders of one of its clerks. Considering the manner in which the Journals are kept, such accidents must necessarily be of very frequent occurrence, and, that they do really frequently happen is evidenced by the fact that it occurred in at least two, if not more, out of the some dozen cases cited in this opinion. It is true that there is, also, one case of an enrolment by mistake, which was discovered in season to defeat it by a further certificate appended. But it is evident that such mistakes are likely to occur with much less frequency than errors in the Journals. Besides, the vast importance of having some authentic final record accessible to all, which can be relied on to show conclusively what the law is, without being obliged to trace an Act through all its various manipulations during its passage through the two Houses and their committees, and which is not liable to be overturned on account of some latent defect long after it has been acted upon by the public, and for years become a rule of property, must be apparent to all. Better, far better, that a provision should occasionally find its way into the statute through mistake, or even fraud, than, that every Act, State and national, should at any and all times be liable to be put in issue and impeached by the Journals, loose papers of the Legislature, and parol evidence. Such a state of uncertainty in the statute laws of the land would lead to mischiefs absolutely intolerable.

In the case of *Green* v. *Graves*, 1 Doug. R., Mich., 351, as reported, although the question was raised as one of law on demurrer, it does not appear in what manner the fact that the Act in question was not passed by a two-thirds vote was made manifest to the Court, nor is there sufficient stated in the report to enable us to determine what bearing the decision has upon the question. (See, also, *Eld* v. *Gorham*, 20 Conn.

12 ; *Duncombe* v. *Prindle*, 12 Iowa, 11 ; and *Foulke* v. *Flem-
ing*, 13 Ind. 412, which sustain the views expressed in this
opinion.) With the exception of the case of *Fowler* v. *Pierce*,
2 Cal. 165, in our own State, and some few others cited in
those commented on, these are the only cases bearing upon
the question that have fallen under our observation, although
we do not by any means claim to have exhausted the sources
of information.

The result of the authorities in England and in the other
States clearly is, that, at common law, whenever a general
statute is misrecited, or its existence denied, the question is
to be tried and determined by the Court as a question of law
—that is to say, the Court is bound to take notice of it, and
inform itself the best way it can ; that there is no plea by
which its existence can be put in issue and tried as a question
of fact ; that, if the enrolment of the statute is in existence,
the enrolment itself is the record, which is conclusive as to
what the statute is, and cannot be impeached, destroyed or
weakened by the Journals of Parliament or any other less
authentic or less satisfactory memorials ; and that there has
been no departure from the principles of common law in this
respect in the United States, except in instances where a
departure has been grounded on, or taken in pursuance of
some express constitutional or statutory provision requiring
some relaxation of the rule, in order that full effect might be
given to such provisions ; and in such instances the rule has
been relaxed by Judges with great caution and hesitation, and
the departure has never been extended beyond an inspection
of the Journals of both branches of the Legislature.

It remains to be seen whether there is anything in our Con-
stitution or laws requiring or authorizing a departure from the
common law rule. The Constitution, it is true, in general
terms, provides that " each House shall keep a journal of its
own proceedings, and publish the same ; and , the ayes and
noes of the members of either House on any question shall,
at the desire of any three members present, be entered on the
Journal." (Article IV, Section 11.) And Section 17 of the

same Article, provides, that, "Every bill which may have passed the Legislature shall, before it becomes a law, be presented to the Governor. If he approve it he shall sign it; but if not, he shall return it, with his objections, to the House in which it originated, which shall enter the same upon the Journal, and proceed to reconsider it. If, after such reconsideration, it again pass both Houses, by ayes and noes, by a majority of two thirds of the members of each House present, it shall become a law notwithstanding the Governor's objections. If any bill shall not be returned within ten days after it shall have been presented to him (Sundays excepted), the same shall be a law in like manner as if he had signed it, unless the Legislature, by adjournment, prevent such return."

But there is no provision or law declaring how the Journals shall be authenticated, or what shall be their effect. There is nothing requiring the ayes and noes to be entered in any case, except at the option of three members. Even when an Act is returned without the approval of the Governor, although there is a provision requiring the question to be taken by ayes and noes, and that it be passed by a majority of two thirds of the members of both Houses present, there is none requiring the ayes and noes to be entered on the Journals, unless demanded by three members present, under section eleven. In this respect our Constitution differs from those of New York and Illinois, and the whole question of the effect of the Journals as evidence of the acts of those bodies is left open. They are still, like the Journals of Parliament, mere memorials—evidence for some purposes, perhaps, but not for all. They are not records in the proper sense of that term. The mode of authenticating statutes passed notwithstanding the objections of the Governor, and those which become laws by being retained by the Governor more than ten days, as provided in said Section 17, Article IV, is prescribed in the Act of 1852. (Laws 1852, p. 112.) When thus authenticated they are again "presented to the Governor, to be by him deposited with the laws in the office of the Secretary of State." (Sec. 1.) When so authenticated and deposited they

become records. There is nothing in the Constitution, then, that requires or authorizes us to avoid, correct or in any way modify, by aid of the Journals, the Acts of the Legislature properly enrolled, authenticated and deposited with the Secretary of State as records of the Act, and we know of no provision of the statute imparting to the Journals any greater dignity than that which pertains to the Journals of Parliament. Much less is there any authority for resorting to the bill as originally introduced, with the loose tags appended containing proposed amendments, and the memoranda of the action indorsed, or to parol evidence for the purpose of impeaching the record. But for the purpose of showing the character of evidence we should find, admit, for the present, that it is competent to go behind the Journals, as well as the enrolled Act, and look at the bills. We shall, in this instance, find a bill which purports to have been passed by the Senate. Attached to it are three tags, each containing amendments. The first and second tags each have memoranda on the face, "adopted," "lost," and the third "lost." Now, as to two of the amendment tags, which is correct—"adopted," or "lost?" Each carries upon its face both words. Besides, there is nothing in the papers or Journals to show that these tags did not come with the bill from the Senate. The amendments indicated are enrolled and authenticated by the proper officers as a part of the Act, and it may be, and the presumption perhaps is, from the documents alone, that they were incorporated into the bill in the Senate; that the bill thus amended, as is frequently done, was considered as engrossed, without actual engrossment, and transmitted to the House. There is nothing in the documents to show that these tags contained the amendments proposed by the Military Committee of the Assembly which were rejected. The documents, then, with the exception of the memorandum "lost," on the last tag, are not necessarily inconsistent with the idea that these amendments were actually made in the Senate, and we are compelled to fall back still further upon parol testimony to assist in overthrowing a solemn official record, and such was the course

actually pursued on the trial. The question, then, whether an important public law, upon which the rights of all our citizens depend or may depend was ever passed, is to rest, through all time, upon equivocal memoranda upon amendment tags and the frail recollection and veracity of man.

When we once depart from principle—from a sound rule of law—where shall we stop? Do not the circumstances of this case open to our vision a vista of absurdities into which we shall stumble if we attempt to explore forbidden fields for evidence of a vague, shadowy and unsatisfactory character upon which to overthrow the enrolled statutes of the land?

In this case, the enrolment, the record of the statute, exists, and we are satisfied that we should not look beyond it, certainly not beyond the record, aided by the Journals, and looking at both, we must hold the entire Act to be a valid law.

If any inconvenience is likely to result from the common law rule, the Legislature is the proper body to provide a remedy. It can guard by proper restrictive provisions against other and greater inconveniences by designating the cases in which, and the circumstances and limitations under which an enrolled statute may be impeached. It may limit the time within which the impeachment must be made, and the character of the evidence which may be introduced.

It is quite evident that much of the reasoning in *Fowler* v. *Pierce*, 2 Cal. 165, is opposed to the views here expressed. In that case the bill went through all the forms of legislation, and was submitted to the Governor for his approval before the final adjournment of the Legislature, on the 1st of May, 1851. It only remained to approve the bill, notify the Legislature of the fact, and deposit it with the Secretary of State as the record of the Act. The Legislature adjourned on that day, but the bill was not in fact signed, or deposited with the Secretary of State until May 2d, after the adjournment of the Legislature, and, when the Governor had no authority to give vitality to the bill, or make a record. It was, however, signed and deposited on that day, but dated

May 1st, and not on the day on which the act was performed. The question was whether it could be shown, contrary to the date appearing on the Act itself, that the record was in fact made on the following day, when the Governor was not authorized to make any record at all. The question was, did it ever become a record, it having been actually made at a time when there was nobody in existence having power to perform the act. Possibly the case may be distinguished and taken out of the rule. But, if not, it must be overruled.

It follows from the conclusions attained that the judgment of the District Court must be affirmed, but upon views in some respects different from those which seem to have prevailed in the Court below.

Judgment affirmed.

[NOTE.—Since our opinion was filed, a decision of the Supreme Court of New Jersey in *The State* v. *Young*, has appeared in Vol. V, p. 679, of the Am. Law Reg. N. S., in which Mr. Chief Justice Beasley, in a very elaborate and able opinion, has discussed the questions involved in *Sherman* v. *Story*, and arrived at the same conclusions attained by us in that case.]