## THOMAS GRAVES v. JOHN T. ALSAP.

Parties to Action can not Stipulate What the Law is that is to govern their case; nor can they stipulate what the action of a law-making body was in a given case, and from the stipulation thus made ask the court to determine whether a general law is or is not in force.

Journals of Legislative Body are not Evidence to the Courts as to what laws were enacted by such body, and, in the absence of other evidence, a court is not warranted in finding that a general act has been passed by such legislative body, where such act has not been published amongst the laws, and no copy of it can be found enrolled in the office of the secretary of the territory, who is the lawful custodian of all original bills that have been properly passed.

APPEAL from the district court of the third judicial district, Maricopa county. The facts are stated in the opinion.

*G. H. Oury*, for the appellant.

All the facts upon which this action is based are stipulated, and come up in the transcript. The law relied on in support of and applicable to this case is as follows: By a law of congress in force on the first day of December, 1873, and which continued in force until the eighteenth day of February, 1875, the power or right was conferred on the legislature of Arizona to pass any act or law over the veto power of the governor, by means of a vote of two thirds of the members of each house. R. S., sec. 1842, p. 327; Id., sec. 5595, p. 1091.

The legislature of the territory of Arizona, on the twelfth day of February, 1875, passed a law making the office of judge of the probate court in the several counties in the territory of Arizona elective, which said law was passed over the veto power of the governor by a vote of two thirds of the members of each house of the legislative assembly. Certified copy of act of twelfth of February, 1875.

No inference or presumption of a legislative construction is to be drawn by reason of the title under which any particular act is placed. R. S., sec. 5600, p. 1091.

The grant of the power or right of the legislature of Arizona to pass any act over the veto power of the governor was accepted and acted upon prior to the eighteenth day of February, 1875, and the right of the people of the territory to elect judges of the probate courts became vested, and can not be disturbed. *Ogden* v. *Blackedge*, 2 Cranch, 272.

The act of congress of the eighteenth of February, 1875, is not retrospective in terms, and can not be so construed. R. S., p. 1435. A statute, when no other time is fixed, takes effect from date. 1 Kent's Com. 455, 458. The title of an act and the preamble to an act are no parts of it. Id. 461.

Every statute which takes away or impairs a vested right acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability in respect of transactions or considerations already past, must be deemed retrospective in its operations, and opposed to

sound principles of jurisprudence. Broom's Leg. Max. 34. A statute shall not be construed retrospectively to affect a vested right, unless it specifically refer to a particular case, or is clothed in words that can have no other meaning unless such a construction is adopted. Id. 36, 37. Whenever it is possible to construe an act not retrospective, the courts will always adopt that construction. Id. 40.

Every law that takes away or impairs rights vested agreeably to existing laws is retrospective and unjust. *Calder* v. *Bull*, 3 Dall. 386. It is a general rule that a statute affecting rights and liabilities should not be so construed as to act upon those already existing; to give that effect, the statute should declare in terms an intention so to act. Statutes should be construed prospectively. *Thorne* v. *San Francisco*, 4 Cal. 133, 139; *Quackenbush* v. *Danks*, 1 Denio, 130. Even with regard to statutes affecting only political regulation or convenience, the rule of construction does not vary. *McIlvaine* v. *Coxe*, 2 Cranch, 280.

There is no doubt at this day, that the established rule of construction adopted in the United States and in England is that statutes shall operate prospectively; the spirit and genius of our institutions imperatively demand this construction. *Dash* v. *Van Kleeck*, 7 Johns. 477; S. C., 5 Am. Dec. 291.

Prior to the first day of December, 1873, the governor of Arizona was vested with absolute veto. Comp. Laws, p. 15, sec. 3. The laws of Arizona are in force until disapproved by congress. Id., p. 16, sec. 7.

*J. T. Alsap*, for the respondent.

The first error assigned by appellant is the conclusion of law by the court, as follows: "The action of the legislature upon the bill mentioned, subsequent to its return by the governor without his approval, was without authority of law and was void." The action of the legislature referred to was that of again considering the bill after its return by the governor without his approval.

The respondent contends that section 1842 of the revised statutes of the United States, which is relied upon by the appellant, was amended, and was controlled by the amendment of said section as found in section 1 of an act

entitled " An act to correct errors and to supply omissions in the revised statutes of the United States." Both the original act and the amendment purport to show what the laws of the United States, of a general nature, were on the first day of December, 1873. If the law of the revised statutes, as amended by the amending act, was the law on the first day of December, 1873, then the action of the legislature of Arizona on the twelfth day of February, 1875, in again considering a bill after the governor had returned it without his approval, was void. That it was the intention of congress to make both the original act and the amendment take effect from the first day of December, 1873, see section 5595 of the revised statutes of the United States on page 1091, and the first paragraph of section 1 of the appendix or amending act on page 1433 of revised statutes, and also the title of the original act.

That it was the intention of congress to make both acts take effect at the same time, see section 2 of the amendment on page 1437, revised statutes.

On the twentieth of June, 1874, congress passed an act entitled. "An act providing for the publication of the revised statutes and laws of the United States" (18 Stat. at Large, 113), by which the secretary of state was directed to prepare certain "head-notes, marginal notes, references," etc., and when so prepared to certify the law, and when so certified and printed and promulgated, it should be legal evidence of such law. The secretary of state completed the work on the twenty-second day of February, 1875. See certificate of secretary of state on page next to title-page, revised statutes. This was ten days after the legislature of Arizona adjourned.

The election held in the county of Maricopa for the election of a probate judge on the first Monday in May, 1875, was void. No law authorizing an election to be held on that day is to be found in the printed statutes of the territory, nor is there such a law on file among the enrolled laws of the territory in the secretary's office. "The official printed volumes of the acts are the usual and authentic evidence to the court of the statute law." Dwarris on Stat. L. 135. In *Bolander* v. *Stevens*, 23 Wend. 132, the chancellor says he has very little doubt that the court is not authorized to look

beyond the printed statutes to ascertain whether the law was passed by a two-thirds vote.

In *People* v. *Purdy*, 2 Hill, 34, Justice Bronson says that, *for the purpose of giving effect to a constitutional provision,* he felt called upon to look beyond the printed statute book and examine the statute roll. There is no intimation that it would be admissible to carry the investigation further, and he regarded it as a matter of doubt whether it should be carried to this extent.

The case went to the court for the correction of errors, and the chancellor (Walworth) took the same view of the question as did Justice Bronson, but he gave no intimation that it was admissible to go beyond the statute roll, but says " it [the statute roll] is to be considered the only legal evidence that the bill has in fact passed." In considering the matter, there was no question relating to the journals of the legislature.

"A record or enrollment is a monument of so high a matter, and importeth in itself such absolute verity, that if it be pleaded there is no such record it shall not receive any trial by witness, jury, or otherwise, but only by itself." 2 Bla. Com. 330; *Sherman* v. *Story*, 30 Cal. 253.

" If the journal were every way full and perfect, yet it hath no power to satisfy, destroy, or weaken the act which, being a high record, must be tried only by itself." *Pacific Railroad* v. *Governor of Missouri*, 23 Mo. 353. " So it appears by the common law the statute roll was the absolute and conclusive proof of a statute. This record could not be contradicted. It implied absolute verity." Id. 364.

" Neither the journals of the legislature, nor the bill as originally introduced, nor the amendments attached to them, nor parol evidence, can be received in order to show that an act of the legislature, properly enrolled, authenticated, and deposited with the secretary of state, either did not become a law in accordance with prescribed forms, or did not become a law as enrolled. * * * If the fact of the passage of a law be denied, the question is to be tried and determined by the court as one of law, and can not be put in issue and tried as one of fact." *Sherman* v. *Story*, 30 Cal. 253.

" The plain answer is, that we can not look into the jour-

nals of the legislature to see when a bill was introduced, or how it passed through the two houses. If an act is properly enrolled, authenticated, and deposited with the secretary of state, it is conclusive evidence." *People* v. *Burt*, 43 Cal. 560.

If the enrollment, authentication, and depositing with the secretary of state are conclusive that a law has passed, the want of all these things is conclusive that there is no such law. If the journals of the legislature be referred to, it will be found that after passing the bill the second time it was by *special committee* (not in the ordinary manner) returned to the *governor*. The governor is not the custodian of the laws of the territory, nor is he required to care for their preservation more than any other citizen of the territory. His connection with the bill ceased when he returned it to the house in which it originated, with his objection.

There is no statute requiring of him any other duty as to the bill save to approve or disapprove. The secretary of the territory is required by law to "secure and safely keep in his office all original acts and joint resolutions of the legislature." Comp. Laws, sec. 2, c. 15, p. 185. To say that there is such a law as is claimed by the appellant, when the same is not found either in the printed statutes or on file among the enrolled laws, is putting on trial for official misconduct the secretary of the territory and the legislative council in a merely collateral proceeding, in which they are not parties and are wholly unheard, and "is a violation of their constitutional rights and the plainest dictates of justice." The legislature evidently did not intend that the act should become a law, for it can not be supposed that the legislative council were ignorant that the secretary was the custodian of the laws of the territory, and that in his office was the proper place to deposit the act to make it effective.

By Court, PORTER, J.:

This is an action in the nature of a *quo warranto*, in which the plaintiff seeks to obtain possession of the office of probate judge of Maricopa county. The complaint alleges that the plaintiff is probate judge of Maricopa county; that on the first Monday in May, 1875, an election was held for

the office of probate judge therein, for the term of two years from the first Monday in June, 1875, and that at such election the plaintiff was duly elected; that he received a certificate of such election from the proper officers and in due form; that he gave bond and qualified as required by law, and that he demanded of the defendant and was entitled to the possession of said office of probate judge, further alleging that the defendant had on the first Monday in June, 1875, usurped said office, and has ever since withheld the same from plaintiff, demanding judgment against the defendant that he be ousted from such office and plaintiff put in possession of the same.

The defendant, in his answer, denies that the plaintiff is probate judge of Maricopa county; denies that the plaintiff was elected to such office at any lawfully authorized election therefor—that the election pretended to have been held in said county on the first Monday of May, 1875, was not authorized to be held by any statute law of the territory of Arizona.

. He further alleges, that the defendant was probate judge of Maricopa county; that he held said office by appointment of the governor of the territory of Arizona, under a commission from him dated the twenty-third day of February, 1875; that said commission by its terms appointed him such judge, to have and to hold the same until the thirty-first day of December, 1876; that he had executed the official bond, taken the oath as required by law, and was in the lawful possession of the office of probate judge.

On the trial of the cause no evidence was given by either party, but the case was submitted on stipulations between the parties as follows: That on or about the twenty-fifth day of January, 1875, a bill was introduced in the legislature of the territory of Arizona, then in lawful session, authorizing and directing that a general judicial election be held throughout the territory on the first Monday in May, 1875, and every two years thereafter, and that at such election a probate judge for each of the counties should be elected; that said bill passed both houses of said legislature, was duly enrolled and presented to the governor for his approval; that the governor returned said bill to the house where it originated—to wit, the council—on the twelfth day

of February, 1875, without his approval; that on the same day the council again passed the said bill by a vote of two thirds of the members thereof, the vote being taken by yeas and nays; that the said bill was then in the regular manner transmitted to the house of representatives for its action, and on the same day the said house passed the said bill by a vote of two thirds of its members, the vote having been taken by yeas and nays, and the said bill was then regularly returned to the council. The council returned the bill to the governor.

It is further stipulated that the election, or pretended election, mentioned in plaintiff's complaint was held as therein stated; that the plaintiff received the greater number of votes; that he received a certificate of election from the board of supervisors; that he executed an official bond, and demanded and was refused possession of the office, as alleged in the complaint; that defendant held said office by commission of the governor, in manner and form as set forth in defendant's answer.

The stipulations in this case do not appear to relate to any questions of fact between the parties that are personal and private in their nature, the determination of which might affect only the interest or conduct of the parties to this action; but they relate almost wholly to what transpired on certain days in a legislative body when having under consideration the question of the passage of a law to provide for the election of a probate judge in every county of the territory—a law general in its character, of interest to the living, and affecting the estates of the dead.

The issue raised by the pleadings clearly is, whether at the time stated in the complaint there was a law of the territory in force authorizing the election of a probate judge in Maricopa county. If there was such a law authorizing such an election in Maricopa county on the first Monday in May, 1875, the same law authorized a similar election in each county in the territory. If the law was then in force, it is still in force, and will by its terms authorize a similar election in May, 1877.

The court was asked to decide the issue, the determination of which reached far beyond the parties of record—to every county of the territory; to decide this not by taking judicial

knowledge of such a law, by examining the printed statutes, or the office of the properly appointed custodian of the original copies of laws passed—not even from the proved action of the legislature in considering such a law, but solely from the stipulations of the parties.

We hold that parties to an action can not properly stipulate what the law is that is to govern their case, and that courts should not regard such stipulations when made, and we are equally of the opinion that they can not stipulate what the action of a law-making body was in a given case, and from the stipulations thus made ask the court to determine whether a general law is or is not in force.

The agreement of parties that a statute with certain provisions is in force does not make it in force. The agreement of parties that a law-making body did certain things when considering a bill, even though the things they agree between them to have been done were all that were necessary in the opinion of a court to constitute its passage, does not constitute the bill a law. In deciding the issue raised, which we think would have been better raised by demurrer than by answer, we shall not regard the stipulation.

Was there, then, a law of the territory of Arizona authorizing the election of probate judge in Maricopa county, as alleged in the complaint? There is no such law among the published laws of the territory. There is no copy of such law in the office of the secretary of the territory, the officer who is the lawful custodian of the original bills that have been properly passed. Not finding any evidence of the existence of such a law in the published laws or in the office of the secretary, is it competent for the court to examine the journals of the two houses of the legislature, and seek there to find evidence of such law having been enacted and still in force?

The language of the authorities as marshaled in a leading case, *Sherman* v. *Story*, 30 Cal. 253, is stated that " the result of the authorities clearly is, that whenever a general statute is misrecited, or its existence denied, the question is to be tried and determined by the court as a question of law. There is no plea by which its existence can be put in issue and tried as a question of fact." In the same case it was held, " that the court, upon passing upon the validity

of a law that appeared among the published laws, would not examine the journal or the enrolled bill to see if it was published as passed."

If it is not competent in such a case to examine the journal or enrolled bill, to verify or alter the published law, it appears to us still more certain that the same rule should govern in a case like the present, where there is a total absence of any evidence of legislative action upon the law in question. If the enrollment, authentication, and depositing with the secretary of state is conclusive that a law has passed, the want of all these things may be conclusive that there is no such law. It appears to the court that it was never intended that the journals of a legislative body were to be regarded as evidence to the courts as to what laws were enacted by it, and that a court, in a merely collateral issue, would not be warranted in declaring a general law in force on such evidence alone.

The presumptions of law all are, that if the legislature had passed the law under consideration the same would have appeared among the published laws, or at least they would have seen that the secretary of the territory was provided with an enrolled copy thereof.

We are therefore of the opinion that on the first Monday in May, 1875, there was no law of the territory authorizing the election of a probate judge in Maricopa county, and that the election so held was without authority of law, and void. It follows from these conclusions that the judgment of the district court must be affirmed, but upon views in some respects different from those which seem to have prevailed in the court below.

Judgment affirmed.

TWEED, J., concurred.

DUNNE, C. J., delivered the following dissenting opinion:

I can not concur in the judgment of the majority of the court affirming the decree below, for the following reasons:

The plaintiff Graves, claiming to be the duly elected probate judge of Maricopa county by vote of the people, brought his action to oust from said office the defendant Alsap, claiming to hold the same office under appointment from the governor of the territory.

The case was tried by the court without a jury. The court found the following facts:

1. The jurisdictional facts as to the institution of the action, waiver of service, appearance of parties, facts of trial, etc.

2. This is literally copied. "That on or about the twenty-fifth day of January a bill was introduced in the legislature of the territory of Arizona, then in lawful session, authorizing and directing that a general judicial election be held throughout the territory on the first Monday in May, 1875, and every two years thereafter, and that at such election a probate judge for each of the counties should be elected; that said bill passed both houses of said legislature, was duly enrolled and presented to the governor for his approval, and that the governor returned the said bill to the council where it originated, on the twelfth day of February, 1875, without his approval, and on the same day the council again passed the said bill by a vote of two thirds of the members thereof, the vote having been taken by yeas and nays; that the said bill was then in the regular manner transmitted to the house of representatives for its action, and on the same day the house of representatives passed the said bill by a vote of two thirds of its members, the vote having been taken by yeas and nays, and the said bill was then regularly returned to the council, and that the council returned the bill to the governor."

3, 4, 5. In substance. The election was ordered in Maricopa county, and plaintiff elected thereat to the office of probate judge and qualified, etc., all in accordance with the requirements of said alleged law.

6, 7. In substance. That defendant was appointed to said office by the governor on February 23, 1875, under the old law, qualified, etc., and was in possession of the office.

As conclusions of law from the foregoing facts, the court found, in substance:

1. That the action of the legislature upon said bill, subsequent to the return of the same to it by the governor, was "without authority of law and was void."

2, 3. That the said election for probate judge in Maricopa county was without authority of law and was void, and plaintiff therefore not entitled to the office.

4, 5. That the defendant is entitled to the office and to judgment accordingly.

Judgment was entered in favor of defendant.

Plaintiff appears and assigns for error:

1. That the court erred in finding the conclusion of law that the action of the legislature upon said bill, after the return thereof without the approval of the governor, was "without authority of law and void."

2. That the court erred in finding the conclusions of law that the election was void.

3, 4, 5, 6. That the court erred in finding, as conclusion of law, that plaintiff was not entitled to recover and that defendant was.

It will thus be seen that if the regularity of the proceedings below be admitted, all the facts relating to this particular case are settled, as regularly found by the court sitting as a jury. They are established just as effectually as if they had been found by a jury of twelve men. They have been found by a jury, that is, by the court sitting as a jury. The findings of facts were reduced to writing and filed. There is no exception by either party as to the correctness of the finding of facts. All the facts which govern the case as between these parties are absolutely settled, and there can now be no question raised by either party as to which facts are or are not proven in this case so far as the act of finding was warranted by law. The error assigned is not that there has been any improper finding of facts, but that the court did not draw correct conclusions of law from those facts established on the trial.

The conclusion of law found below, upon which the court determined plaintiff's demand, was this, that the action of the legislature upon the bill, after it was returned by the governor without his approval, was without authority of law and was void.

The question here is, Was that proceeding regular? and if so, was it a correct conclusion of law upon the facts established on the trial?

The conclusion involves two propositions: 1. That the acts of the Arizona legislature in the premises were without authority of law; 2. That the acts were void.

The learned judge below did not find that the acts were

without authority and *therefore* void, but that they *were* without authority *and* that they were void.

Let us first examine whether the acts were or were not done without authority. All authority in the matter is regulated by the acts of congress. The legislature of Arizona had just so much legislative authority, and no more, as is given by the laws of the United States.

The following facts appear from the laws of the United States:

1. Up to December 1, 1873, under the laws of the United States, the governor of the territory of Arizona had absolute veto power.

2. On the twenty-second of June, 1874, congress adopted what are called the revised statutes of the United States, repealing all laws of the United States passed prior to December 1, 1873, any portion of which was embraced in any section of said revision, except laws of a private, local, or temporary nature.

3. The old law fixing powers of governors of territories as to the veto power was passed prior to December 1, 1873, and was embraced in said revision, and in said revision the provision giving absolute veto power to the governor of Arizona was omitted, and in lieu thereof it was provided that, notwithstanding his veto, a law might be passed by a two-thirds vote of each house of the legislature.

4. The law stood in that shape until the eighteenth of February, 1875, six days after the legislature of Arizona had passed the law over the governor's veto making probate judges elective.

5. On the eighteenth of February, 1875, congress amended the revised statutes by inserting a clause giving to the governor of Arizona absolute veto power.

Defendant, in support of the proposition that the legislature of Arizona had no authority to pass said bill over the governor's veto, argues:

1. As stated in his brief, in the following language: That "on the twentieth of June, 1874, congress passed an act entitled 'An act providing for the publication of the revised statutes and laws of the United States' (18 Stat. at Large, p. 113), by which the secretary of state was directed to prepare certain 'head-notes, marginal notes, references,'

etc., and when so prepared to certify the law, and when so certified and printed and promulgated, it should be legal evidence of such law. The secretary of state completed this work on the twenty-second day of February, 1875. See certificate of secretary of state on page next to title-page, revised statutes. This was ten days after the legislature of Arizona adjourned."

It is not clear for what purpose attention is called to this fact. The case was submitted on briefs, and there was therefore no opportunity of calling on defendant to explain the purport of this proposition. If it be intended to lead to the conclusion that the law itself was not in force until thus promulgated, the answer is, that the law became operative as soon as it was signed by the president. Certified copies of the act would have been evidence of the law at any time after its enactment. This was merely a provision to secure a great number of certified copies in a printed form, which, when duly certified, printed, and promulgated, should everywhere be received as evidence of the law. The same thing is done with the acts of state legislatures; provision is made that printed copies duly attested by the secretary of state shall be received as evidence of the law, but it is not supposed, nor is it the fact, that the laws are not in force until the printed copies are circulated. They are only a convenient means of proving the law.

2. Defendant, speaking of the amendments of February 18, 1875, claims that those amendments were to take effect at the same time as the revised statutes themselves, because of the wording of section 2 of the amendatory act, which reads as follows:

"Sec. 2. That the secretary of state is directed, if practicable, to cause this act to be printed and bound in the volume of the revised statutes of the United States."

I do not think there is much force in the argument that the expression by a legislature of a desire to have two or more laws printed and bound in the same volume, if practicable, is an indication of an intention on the part of the legislature to have all the laws thus bound together take effect at the same time, particularly when the laws were passed at different sessions of the legislature. The more reasonable method to discover when it was intended a law

should go into effect is to look at the provisions of the law itself on that point, and if nothing is said on the subject in the law itself, the presumption is that it takes effect on its passage.

In the British parliament at one time the rule was, that all laws took effect from the commencement of the session; in other legislatures there is a general rule that in the absence of other provisions all laws take effect from the last day of the session; but acts of our congress, in the absence of express provisions to the contrary, take effect from their passage. 1 Kent's Com. 455, note 1.

3. Defendant urges that the title of the original act is an indication that it was the intention of congress to have the amendatory act of February 18, 1875, take effect from the first of December, 1873, and refers us to that title.

On reference, I find that the title reads as follows: "An act to revise and consolidate the statutes of the United States in force on the first day of December, 1873." How that title, of an act passed June 22, 1874, can give any indication of what congress intended in a subsequent act, passed the following year, is not clear.

4. Defendant urges that the intention of congress to have the act of February 18, 1875, take effect at the same time as the act adopting the revised statutes is shown by section 5595 of the revised statutes, and refers us to that section. To this argument there is the same objection as to the last. Section 5595, referred to, reads as follows: "Sec. 5595. The foregoing seventy-three titles embrace the statutes of the United States, general and permanent in their nature, in force on the first day of December, 1873, as revised and consolidated by commissioners appointed under an act of congress, and the same shall be designated and cited as the revised statutes of the United States."

That section is a part of a law adopted June 22, 1874. How the words just cited can give any indication of what congress intended in a subsequent act, passed the following year, is not clear.

5. Defendant urges that the intention of congress to have the act of February 18, 1875, take effect one year, two months, and eighteen days prior to its adoption, is shown by

the wording of the first paragraph of section one of the act itself.

This paragraph, in my opinion, is a mere preamble, which undertakes to state the object of the act, and is in these words: "That for the purpose of correcting errors and supplying omissions in the act entitled 'An act to revise and consolidate the statutes of the United States in force on the first day of December, A. D. 1873,' so as to make the same truly express such laws, the following amendments are hereby made therein."

But a preamble is no part of an act; neither is the title. 1 Kent's Com. 461. Some modern authorities admit they may be parts of the act, but only formal parts, not governing the act itself. In our acts of congress, when the language of the title or preamble is entirely in accord with the spirit of the act itself, it is simply a corroborating circumstance as showing intent. The attention of legislators is especially directed to the provisions of the act itself, to the enacting clause proper. If those are satisfactory to the legislators, they know the phraseology of the title or the preamble is of little moment. The title and preamble are worded in accordance with the ideas of the original introducer of the bill. They are generally in harmony with the bill as originally drawn, but when the bill is submitted to the legislature it becomes the property of the house ; it is often amended and transformed until its original author would not know it. Sometimes, when the fight is over, some member with a logical turn of mind rises and proposes an amendment to the title or preamble which will bring them into harmony with the new bill thus made. Sometimes the changes are so great and the amendments so incongruous that no reasonable length of title could express the purport of the bill, and the original title is allowed to stand, and sometimes it stands through oversight, inattention, or indifference; and all this because legislators know that neither the preamble nor the title constitutes any portion of the act itself, and that the plain provisions of the act can not be affected by any inconsistency or incongruity between the act proper and things which are no part of the act itself. Thus we find that one of the most important acts ever passed by congress, the act changing the whole policy of this

A. T. REPS. I—19

government in the matter of the occupation and ownership of all the mines of gold, silver, cinnabar, or copper contained in the United States, is entitled " An act granting the right of way to ditch and canal owners over the public lands, and for other purposes;" and the most incongruous provisions of legislation are repeatedly found in acts the titles of which show they were introduced for the purpose of making appropriations. The essentials of an act are the propositions enacted; the rest are but attendant circumstances. "Propositions enacted" argues, of course, enacting clause and actual enactment. In cases where the courts find the language of the act so ambiguous that they have to resort to construction to try to discover the intent of the legislature, they may derive some light from a consideration of the title and preamble, as showing, possibly, to some extent, the intent of the legislature; but courts will not permit an act, plain in its own terms, to be made ambiguous because of some inconsistency between the act and its title or preamble. Only such ambiguities will be considered as are raised by the language of the act itself; for it is the act itself courts are required to enforce, not *its title or preamble.*

Let us now look at the legislation of congress on this subject of the revised statutes and see whether the acts themselves are intelligible or not. The initial legislation on this subject of the revised statutes is the act of June 27, 1866, entitled "An act to provide for the revision and consolidation of the statute laws of the United States."

Section one provides for the appointment of commissioners to revise, simplify, arrange, and consolidate all statutes of the United States, general and permanent in their nature, which shall be in force at the time such commissioners may make the final report of their doings."

Section 2, fixing the powers of these commissioners, says they shall bring together all statutes and parts of statutes which from similarity of subject ought to be brought together, omitting redundancies or obsolete enactments, and *making such alterations as may be necessary to reconcile the contradictions,* supply the omissions, and *amend the imperfections* of the original text.

Section 3 provides " that when the commissioners have completed the *revision* and *consolidation* of the statutes as

aforesaid, they shall cause a copy of the same, in print, to be submitted to congress, that the statutes so *revised and consolidated* may be *re-enacted* if congress shall so determine."

Sections 4, 5, and 6 provide for the printing of the report in parts, for contemporaneous criticism, salary of commissioners, clerks, etc.

From this it will be seen that these persons were not compilers to merely report to congress what did exist as the law, but commissioners with power to revise, omit, supply, make alterations, amend imperfections, and report to congress such a body of law as they thought ought to exist, so that congress might, if it chose, *re-enact* such revision and declare it to be the law of the land, in lieu of all former laws on the subject embraced in such revision.

The commissioners, after a lapse of about seven years, submitted a revised and consolidated body of laws. Congress, by a regularly enacted law of March 3, 1873, raised a committee of three to accept on the part of the United States the draft of the revision of the laws thus prepared, but having in view the great powers conferred on the commissioners, and fearful that such acceptance might be construed into an adoption of the revision, they added a saving clause, that the effect of this act authorizing acceptance should not be construed as adopting the revision. Then, subsequently, on June 22, 1874, congress adopted the revision, possibly with amendments of their own added thereto, the same as they would enact any other law, and repealing all prior laws, any portion of which was embraced in said revision. The repealing words are very carefully chosen. They are as follows:

"Sec. 5596. All acts of congress passed prior to said first day of December, 1873, *any portion of which* is embraced in any section of said revision, *are hereby repealed*, and the section applicable thereto shall be in force *in lieu thereof* (all parts of such acts *not* contained in such revision having been repealed, *or* superseded by *subsequent* acts, not being general and permanent in their nature); *provided,* that the incorporation into said revision of any general and permanent provisions taken from any act *making appropriations*, or from an act containing other provisions of a *private, local,* or *temporary* character, shall not repeal or in any way

affect any *appropriation*, or any provision of a *private, local,* or *temporary* character, contained in any of said acts, but the same shall remain in force; and all acts of congress passed prior to said last-named day, *no part of which* are embraced in said revision, shall not be affected or changed by its enactment."

The repeal of the old laws was to date from December 1, 1873, but as the repeal was not made until June 22, 1874, it was seen that acts might have been done, rights might have accrued, and the tenure of office might have continued or have begun under the old laws after December 1, 1873, and before June 22, 1874, the day of the repeal. Then by section 5597, provisions were made for such cases by affirming the general principle of law that acts done and accrued rights could not be affected by such repeal, declaring that such repeal should not affect such acts or rights, nor the term or tenure of such offices.

It was also seen that various acts had been passed since December 1, 1873, and before the enactment of the revised statutes, and it was declared that all such acts should have effect the same as if passed after the enactment of the revised statutes, and then there was a declaration as to what that effect would be. This, so far as congress could do so, is a declaration of the effect of an enactment subsequent to the adoption of the revision. If A. is declared equal to B., and then the value of A. is declared, it is a declaration of the value of B. It was there declared that the effect of a subsequent statute would be to repeal any portion of the revision inconsistent with such subsequent enactment.

The question will arise as to the effect of such repeal upon acts done or rights accrued between the time of the adoption of the revised statutes and date of such repeal, and the answer to that question will, I think, be decisive of one question in this case.

Under the law prior to December 1, 1873, the governors of the territories of Utah and Arizona had absolute veto power. In the territories of Colorado, Dakota, Idaho, Montana, Washington, Wyoming, and New Mexico, the governors had only a qualified veto power.

What report the commissioners made on the subject I do not know, and it is entirely immaterial what they reported.

The act as passed by congress is before us, and is the law on the subject. In that act we find that congress placed the legislatures of all the territories on equal footing in this respect, giving to all of them the power to pass laws over the veto of the governor by a two-thirds vote, the act to date from December 1, 1873, saving and respecting, however, all acts done and all rights accrued between that date and June 22, 1874. The first question then is, Were the provisions of the old laws, giving absolute veto powers to the governors of Utah and Arizona, repealed and no longer in force after December 1, 1873?

The answer is, that they were repealed unless such provisions were of a private, local, or temporary character. They were not *temporary*, because there was no particular time when they should expire. They were not *private*, because they were a part of the general organic act of the territory, and related to the rights of the whole people of the territory. The courts of the territory would certainly take judicial notice of the organic act, which they could not do if they were private acts.

Were these provisions *local* in their character? Local is from *locus*, a place. It is defined by Webster: "1. Pertaining to a particular place, or to a fixed or limited portion of space, as local circumstances; 2. Limited or confined to a spot, place, or definite district, as a local custom."

Was this a provision relating only to a particular place? Was it something affecting a place merely, or something affecting the rights of the people of the United States in general. This was a most important provision, relating to one of the most important political rights a people can have—the right to make their own laws. It fixed their political *status* as a people. It removed restriction on their political power. It referred, not to the place, but to the people thereof, and to the people of the United States. If such a provision can be said to be local in the sense of the revised statutes, every provision concerning any territory is likewise local, for it is as local to give this right in one place as it is to withhold it in another, and on that theory no laws concerning territories have properly any place in the revised statutes, being all local in their nature. By the very act of revising the legislation concerning territories, and consolidating it all into

one uniform body of law, congress declared its understanding to be that legislation on this subject was legislation of a general and permanent nature. If the law fixing the political rights of the people of Utah and Arizona was a local law, in the sense of the revised statutes as to local laws not being repealed, then there was no propriety in making the amendment at all, for if it was a local law, then it was not repealed by the adoption of the revised statutes, but was in force without the amendment. True, this argument is not conclusive, for the amendment might have been made *ex industria*, but the fact that congress treated it as a general law by incorporating the general rule into the revised statutes, and then again treated the Utah and Arizona matter as a general law by inserting the provisions concerning them in the revised statutes, are corroborative facts tending to show that this view of the case is also the one taken by the congress of the United States. This point will be considered again later in this opinion. For the present, I will state that in my opinion all the old laws relating to territories were set aside excepting whatever provisions might have been therein contained of a private, local, or temporary nature, such as the provisions concerning fees of certain officers, the occupation of certain buildings, the prosecution of certain works, or such private, local, or temporary matters; that legislation concerning political power is not local, but that the general scheme of territorial government as to the exercise of political power in passing laws was uniformly fixed by a new general law, and all old laws on the subject were repealed.

The people of all the territories then stood upon an equal footing as to their political rights under the revised statutes until February 18, 1875. Up to that time the people of the territories of Utah and Arizona had power to pass laws over the veto of the governor, the same as people of other territories might do. The people of Arizona, it is claimed, exercised that power on the twelfth of February, 1875, passing, it is claimed, a certain law over the veto of the governor. Then, six days after the law had been so passed, congress amended section 1842 of the law concerning territories, by adding thereto the following provision: "Provided, that so much of this section as provides for making any bill passed

by the legislative assembly of a territory a law without the approval of the governor shall not apply to the territories of Utah and Arizona."

Now, what effect did the adoption of this amendment have upon the law passed by the legislature of Arizona February 12, 1875?

In the absence of any special words in the act of amendment, as to the time it was to take effect, it would of course take effect only upon and after its adoption. The only words which it is claimed govern on the matter are the following, constituting the first paragraph of the act: "That for the purpose of correcting errors and supplying omissions in the act entitled 'An act to revise and consolidate the statutes of the United States in force on the first day of December, 1873,' so as to make the same truly express such laws, the following amendments are hereby made therein."

Now, what is a preamble? Webster, defines it as "an introductory portion; an introduction or preface, as to a book, document, or the like. Specifically, the introductory part of a statute, which states the reasons and intent of the law." This introductory part of the statute which states the reasons and intent of the law is, then, merely a preamble. It makes no difference that it is placed after the enacting clause instead of before it. Whether a certain collocation of words has force as a law or not depends, not upon their location on a page of the statute book, but whether they enact anything or not. Whether there is any law enacted in this paragraph or not is easily seen. Strike out what follows it, except the approval, and there is nothing enacted. There is nothing in it but a declaration of an intention to do something, namely, to correct errors and supply omissions in a certain act, so as to make the said act truly express what laws were in force December 1, 1873. It is claimed that these words make the amendments take effect at the same time with the act they amend. But suppose there was a concluding section saying they should take effect thirty days after the date of their passage; which would govern then, the preamble or the concluding section? The latter of course. But why? Is it because they would be the later expression in the act on the subject? No; for they would not be the *later* expres-

sion in the act; they would be the *only* expression in it on the subject, for the preamble is not a part of the act. There is no expression here in the act proper as to when the amendments are to take effect. They therefore take effect from the date of their adoption.

The preamble says the act is to correct errors and supply omissions, but, as I understand it, the first thing the act does is neither to correct an error nor to supply an omission, but to repeal sections and enact new ones, so as to change the law concerning how stationery shall be furnished to congress.

Is an act declaring how the clerk of the house shall buy his stationery to be considered a law general and permanent in its nature, and yet an act affecting the political rights of the whole people of the United States, to be considered a private, local, or temporary act? In the revised statutes, which it is declared contain the laws of a general and permanent character, we find acts regulating the management of the Smithsonian Institution, the salary of pages to the senate and house, compensation of one laborer in charge of private passage, the salary of the steward of the president's household, etc. Why are these considered general acts? Is it not because the people of the whole United States are interested in these salaries, since they have to foot the bill? And are not the whole people of the United States affected by this legislation concerning the veto power of the governor of a territory? Each separate territory is the property of the people of the United States. It is governed by officers appointed indirectly by the people of the United States; all the salaries of all those officers, as well as those of the members of the local legislature, and all the expenses attending the passage and printing of the laws, are paid by the people of the whole United States. The people of the United States are interested in all that concerns the government of these territories; but when it comes to the matter of making laws for these territories, as the law stood December 1, 1873, and as it now stands, the whole people of the United States are a part of the law-making power of the territory of Arizona—a part of the legislature. To pass a law in Arizona at present, three consents are necessary—the consent of the assembly, the consent of

the council, and the consent of the governor. There are thus three independent houses, so to speak, through which a bill must pass before it can become a law. The governor does not act for himself in this matter, of course. For whom does he act? Whom does he represent? Not the people of Arizona, for they did not make him governor: he represents the people of the United States, for it is they who indirectly have placed him there as a part of the legislature of that territory to act for them, the only owners and sovereigns of that territory.

The people of the United States said they would not trust the entire legislative power over the territory of Utah to the people there, because they felt there was a two-thirds majority there which would make laws of which they did not approve, and they reserved to themselves the right to an absolute veto, to be exercised by their governor. For some reason they declared the same thing with regard to Arizona. They will not even trust their governor in some of the territories, but reserve a further right of veto, even over his consent, to be exercised by their representative in congress.

Can it be said that a law that reserved to the people of the United States the right to absolutely veto the acts of the people of Arizona and Utah was a local law, affecting only the people of those territories? Did it not directly affect the people of the whole United States? If it was *not* a local law, then it was repealed the day the revised statutes were adopted, for it was not contained in those statutes, and all other laws were repealed except those of a private, local, or temporary character.

Congress has passed many acts concerning the rights of the people of the territories, and it has so carefully guarded the rights of the people of the United States to govern these territories themselves that in no two of the territories are the political rights of the people and right of *habeas corpus* the same.

In Idaho, legislative acts become laws unless vetoed in three days; if vetoed, they may be passed by a two-thirds vote; it is not necessary to submit them to congress for approval. Postmasters may hold territorial offices; the people control the government penitentiary; the delegate elected to congress must be a citizen of the United States;

the people can not assign the districts of the federal judges; they can not establish courts and fix their jurisdiction; they can not fix the day of electing their delegate to congress; and they are not entitled to *habeas corpus* on the same grounds as in the District of Columbia.

In no other territory are the rights of the people the same in all these respects. In two territories the veto may be delayed five days; in two the veto is absolute; in one no postmaster can hold a territorial office; in five the people can not control the territorial penitentiary; in six the delegate to congress need not be a citizen of the United States; in seven the people may assign the judicial districts; in seven the people may fix the day for electing delegates; in seven the people may have *habeas corpus* for the same reasons as in the District of Columbia; in only one can the people establish courts and fix their jurisdiction.

All of these laws are in the revised statutes of the general laws of the United States. Can any one of these provisions be said to be an exception to a rule? If so, which is the rule, and which is the exception? They can not be local acts, because they affect the rights of the whole people of the United States; they are not considered local by congress, because the commissioners, the men chosen as learned in the law, present them as general laws; congress, which may be supposed to know the difference between a general and a local law, enacts them in the revised code of general laws.

In what, then, does their generality consist? Not in the application of the rule; for there is no general application of any rule, except the rule that the governing power of all territories is in the whole people of the United States; that not even a law creating the office of constable may stand if the people of the United States at large do not choose to have it so. The generality of this consists in this: that all these acts are legislation on the general subject of the political rights of the people in the territories, and that every act on the subject affects the whole people of the United States, as either taking some power from them and giving it to the people of the territory, or recalling some such power already granted.

There is another fact which goes to show that congress

did not consider that a provision affecting only a particular territory was therefore a local provision.

Title 23 of the revised statutes is devoted to legislation concerning the territories, but it is divided into three chapters: Chapter 1, consisting of fifty-six sections, is headed, "Provisions Common to All the Territories;" chapter 2, containing fifty-seven sections, is headed, "Of Provisions Concerning Particularly Organized Territories;" chapter 3, composed of twenty-two sections, is headed, "Provisions Relating to the Unorganized Territory of Alaska." Now, there is nothing in the chapter relating to Alaska which applies to any other territory of the United States. No provision is made allowing the people of that territory to make laws in any manner for their own government, but it is declared they shall be governed by the general laws of the United States; that is, governed by the people of the whole United States, to whom the territory belongs.

No courts are established in Alaska for the administration of those laws; but the Alaskans are given over to the jurisdiction of the United States district courts of California, Oregon, and Washington. The principal industry of the territory, the seal-fisheries, is placed under the control of the treasury department of the United States. The secretary of the treasury is authorized to appoint an agent to manage the seal-fisheries, and to perform such other duties as the secretary may assign to him. This agent is the local representative in Alaska of the power and authority of the United States.

This act concerning the unorganized territory of Alaska is local, in the sense that it relates on one side to Alaska, but on the other side it relates to the owners and sovereigns of Alaska—to the whole people of the United States—as indicating how their power shall be felt in Alaska. It is a declaration of the sovereign power as to how Alaska shall be governed, and affects, not only the people who live in Alaska, but the people who bought, paid for, own, govern, and control Alaska, and it is therefore a general law, and is in its proper place in the code of general laws. If it was a mere local statute, it had no business in the general code. If it was a mere local act, it remained in force without a re-enactment. But congress did not look upon it as a local act,

and the people of the United States do not consider that the government of Alaska is a mere local matter with which they have nothing to do.

In the same way congress enacted in chapter 1, fifty-six provisions common to all territories. There remained, then, in the old laws a great number of particular provisions, some relating to only one territory, some to two or more territories. If those provisions were regarded as mere local exceptions to a general law, and therefore as mere local laws, they would have kept their place in the statute book without re-enactment; but congress did not look upon it in that light. On the contrary, it went carefully through all the laws relating to territories, collected all those acts called by counsel "local exceptions" but called by congress "provisions concerning particular territories," and re-enacted such of these particular provisions as they still desired to continue in force, enacting them in a separate chapter of title 23. In that chapter they filled fifty-seven sections with such particular provisions, even to the point of regulating where the United States marshal should have control of a federal prison and where he should not. If we can not judge by this what were the particular provisions they intended should be continued, how can we judge? There is a maxim, *Expressio unius, exclusio est alterius.*

But here is an expression as to an intention to retain fifty-seven particular provisions, the fifty-eighth left out, and yet it is claimed that we are bound to consider that they intended to retain the fifty-eighth also.

I take it, then, that in leaving out the particular provisions, existing in two separate acts, which gave absolute veto powers to the governors of two territories, congress intended they should be left out, and that the old laws on this subject were repealed by the adoption of the revised statutes. We can not consider them as in force after the adoption of the revised statutes, without construing directly against the letter of the statute. And so far as the spirit of the act is concerned, the action of congress in the matter, having had its attention called to particular provisions, having legislated on particular provisions, having declared what ones it intended to retain, shows, if it shows anything, that congress acted in the matter with full notice of these provisions, and deliber-

ately omitted them. To construe against the very letter of the law, is to go to the extreme limit of judicial power in the matter, and will never be done if any reasonable construction can be given to the law as it now stands.

Is there anything unreasonable in thinking that congress meant to do what it did do? There were nine territories, and in seven of them the people were granted full legislative powers. In two of them this power was restricted by a particular limitation; the act, as it stands, removed the particular limitation and placed all upon an equal footing.

Are we to leave the plain, direct, unequivocal language of the statute, and go about the law, behind the law, and presume an intention different from what is expressed, and construe on that presumed intention, set aside the letter of the law, destroy uniformity and set up diversity, where the effect of the statute as it stands is to remove diversity and establish uniformity?

It is claimed that the legislation concerning the government of the District of Columbia is not in the revised statutes, and that that is an argument to show that congress looked upon that legislation as local. This is a mistake. The legislation concerning the District of Columbia is found in the revised statutes. It is true it is not found in the first volume thereof, but congress specially ordered that "the revision of the statute relating to the District of Columbia, to post-roads, and the public treaties" be published in a separate volume, and entitled and labeled "Revised statutes relating to the District of Columbia, and post-roads, and public treaties," which has been done.

An act granting certain powers may be a general act. The power thus granted may be exercised only in a particular place. The power may be exercised only in a certain locality, but the act granting the power may still remain a general act. States pass general laws concerning notaries public, providing for a certain number in each county, but limiting the exercise of notarial power to the county in which the notary resides. An exception is made as to one county, providing that the notaries of that county may exercise notarial power in an adjoining county, also thus giving the notaries of one county more power than is given to others. Then comes a revision of the statutes, in which, by general law,

notarial power is abolished. There is a section in the revision saying that all general laws not in the revision are repealed. Would the notaries of the favored county still have notarial powers, on the plea that they had them by virtue of a local law?

A law is not necessarily local because it seems to operate only in a particular locality. The territory of Arizona was acquired by treaty; that is, the territorial area now called Arizona was so acquired. A treaty is a law of the land; was that law by which Arizona was acquired a local law, affecting Arizona alone? It seemed to relate only to Arizona; it seemed to simply change the political condition of the people of Arizona, effecting a change in their citizenship, but that was by no means the extent of the operation of the law. That law, which seemed limited in its effect to Arizona, really affected every member of the body politic of Mexico and of the United States. It affected a change in political and proprietary rights. Would a law transferring Cuba to the United States be a local law? It seems to relate only to the statutes of Cuba. Would a law ceding Arizona back to Mexico be a local law? It seems to apply only to Arizona. Why is it not a local law? Because in ceding Arizona to a foreign power the people of the United States would divest themselves of proprietary and political rights.

The people of the United States by treaty acquired the political right to make laws for the government of Arizona. Any law by which the people of the United States become divested of those rights, in whole or in part, is a general law, because it concerns the people of the whole United States. When the people of the United States cede political power to the people of Arizona, they are divesting themselves of it for the time being as completely as though they ceded those rights to Mexico. It may be called a *lease* of power, as distinguished from an absolute divestment, because in one case it can be resumed at will, in the other not; but even then, does not a lease of rights affect both parties to the act, the lessor as well as the lessee?

When the people of the United States ceded to the people of Arizona a limited power of making their own laws, the law by which it was done was a gene al law, because it affected the political power of the whole people of the United

States.  The act, then, which gave the people of Arizona power to make such laws as might receive the sanction of the governor was a general and not a local law, because, though it affected the people of Arizona very materially in giving them a certain amount of political power, it affected the people of the United States to the very same extent, for the gain of the people of Arizona was the exact measure of the loss of the people of the United States.

I am therefore again led to the conclusion that the act fixing the political power of the people of Arizona prior to December 1, 1873, was a general law, and was repealed by the adoption of the revised statutes June 22, 1874, which established a different rule on the subject, increasing the political power of the people of Arizona by giving them power to pass laws notwithstanding the objections of the governor.

It is, however, contended they did not have power to do so on February 12, 1875, by reason of the amendatory act of February 18, 1875.

Having considered the old law as repealed, we may then look on the revised statutes of June 22, 1874, as the original law on this subject, and the question will then be as to the effect of the amendment of February 18, 1875.  I have already shown that I do not consider there is anything in the amendatory act—that is to say, in the act proper—declaring when the amendments are to take effect, and that they therefore take effect only from their enactment, to wit, February 18, 1875; and that any laws passed prior to that date, and since December 1, 1873, over the governor's veto, stand as laws of Arizona until repealed.  I have shown that I consider that the clause which it is claimed gives these amendments a retroactive effect is merely a preamble.  But suppose it is not a preamble, but in fact a part of the act: even then it could not affect the validity of the law of the legislature of Arizona duly passed February 12, 1875, in accordance with the provisions of the revised statutes of 1874, over the governor's veto, for two reasons: 1. Because congress had no power to give the act that effect; 2. The acts in pari materia show it was not the intention of congress, in the adoption of the revised statutes, to invalidate any

act done or disturb any right which accrued under existing laws.

1. Congress has no power to give a statute such a retrospective effect as will destroy vested rights. The doctrine is stated by Kent in the following language: "A retrospective statute, affecting and changing vested rights, is very generally considered in this country as founded on unconstitutional principles, and consequently inoperative and void." 1 Kent's Com. 455.

The vested right in the case which can not be destroyed is not the right of the plaintiff to the office of probate judge, but is the right to a certain amount of political power which vested in the people of Arizona the day the limitation on their legislative power was removed by the adoption of the revised statutes, June 22, 1874. From that day until February 18, 1875, they had vested in them the right to make laws by a two-thirds vote of the legislature, notwithstanding the objection of the governor. It was shown that there was at least an attempt to exercise that right. An attempt was made to at least thus pass a law. Under that alleged law, if properly passed, the people acquired the right to elect a certain class of judges. Everything that could be done to give the people that right, if the law was really passed, was fully and completely done. True, they had not yet exercised the right of election, but the right of election was not the right which vested under the act of congress. The right which vested under the act of congress was the right to make laws, notwithstanding the objections of the governor, and that right they had exercised, or at least attempted to exercise. Subsequent acts of congress might recall this right of legislation, but they could not recall the acts done while that right existed. A principal may revoke the authority of an agent, but he can not annul acts duly performed and consummated while the authority existed.

Whether congress thought it had the power to do so or not is immaterial. Its power in the matter was exhausted when it passed the law. The powers of the government are divided into three co-ordinate branches, each supreme in its sphere. It is the province of the judiciary to declare the effect of laws. This right is not shared by the legislative

department, but is an exclusive attribute of the judicial power.

The language of what I consider the preamble in the amendatory act of February 18, 1875, undertakes to say that the effect of these amendments shall be to make the revised statutes adopted June 22, 1874, truly express what was the law December 1, 1873, not congress. For congress to undertake to do it is to usurp judicial functions. It would be no more irregular for the president to do this by proclamation than for congress to do it by declaration. In Kent's Commentaries the rule is stated: "It seems to be settled as the sense of the courts of justice in this country, that the legislature can not pass any declaratory laws, or acts declaratory of what the law was before its passage so as to give it any binding weight with the courts." 1 Kent's Com. 456, note *b*, and numerous cases there cited in support of the proposition as to the authority of co-ordinate branches of government. Here is an attempt, on February 18, 1875, by congress to declare what law was in force December 1, 1873. But the courts can not accept the declaration of a legislature that a certain law was in force on a certain prior day. To admit a contrary doctrine would be to take the construction of statutes from courts and give it to the legislature.

The courts must take the statute books, and from them discover and declare what laws were or were not in force on a certain day. Congress claims that the non-insertion in the revised statutes of the provision giving absolute veto power to the governor of Arizona was an omission—that congress intended to insert it. So they might have intended to enact a whole law, but from any cause might have omitted to do it—can we adjudicate upon such an intention?

The doctrine of intention in construction is, that where a law has really been enacted, but its meaning is by its own terms ambiguous, that is, capable of two constructions— "ambiguous, and with double sense deluding"—then if the intention of the legislature can be clearly ascertained, the sense which will give effect to that intention will be adopted.

But to supply a whole proviso of new and independent matter, constituting an exception to the law as it plainly reads, simply because the legislature may declare that they

intended to enact that proviso, but that by some mischance it was overlooked and omitted, is further than courts can be expected to go.

2. When an intention as to the policy of an act is shown by an actual declaration in an act, in the form of an enactment therein, and that policy is in accordance with public policy and sound law, that will be accepted as the declared policy of the act, and as showing the spirit and intention of subsequent acts *in pari materia,* if there be nothing in subsequent acts to make such a construction an unreasonable one.

In the first act adopting the revised statutes, it was declared, in section 5597, that the adoption of these statutes, repealing former acts, should not affect any act done or any rights accrued before the repeal of the former acts. This was because the repeal took place June 22, 1874, to date from December 1, 1873, and this was to save all acts done and all rights accrued while the old acts were in force; in other words, although the repeal was to date back to December 1, 1873, nothing which was regularly done in the mean time should be disturbed, nor any accrued rights be destroyed. In the subsequent act *in pari materia,* it is claimed that it was intended to have the change in the law relate back to a certain date, but the spirit of the organic act saves all acts done and all rights accrued in the mean time. There is nothing in the subsequent act declaring any intention to depart from the declared policy in the organic act in this respect.

The language of the statute is much stronger than the general rule of law on the subject. The general rule is, that rights to be saved must be clearly vested, but the policy of this act is declared in broader terms. It goes so far as to say that every act done and every right accrued under existing laws stands as good, notwithstanding changes in the law. I am therefore of the opinion that on the twelfth of February, 1875, the legislature of Arizona territory had authority and power to pass an act notwithstanding the objections of the governor.

It may then be thought that the only question remaining is, Did they really do it? But that is not the question in this case. The question in this case is, Was it, *in this case,*

under the pleadings, *necessary* to prove, and if so, was it proved, that they really did it? This brings me to the consideration of the second proposition contained in the first conclusion of law of the judge below, in which he said that the acts were void.

2. Were the acts of the legislature void?

On this point the defendant urges in his brief a proposition in the following language:

"6. The election held, etc., was void. No law authorizing an election to be held on that day is to be found in the printed statutes of the territory, nor is there such a law on file among the enrolled laws of the territory in the secretary's office. * * * If the journals of the legislature be referred to, it will be found that after passing the bill the second time, it was by special committee (not in the ordinary manner) returned to the *governor*. The governor is not the custodian of the laws of the territory, nor is he required to care for their preservation more than any other citizen of the territory. His connection with the bill ceased when he returned it to the house in which it originated, with his objections. There is no statute requiring of him any other duty as to the bill save to approve or disapprove. * * * To say there is such a law, as claimed by the appellant, when the same is not found either in the printed statutes or on file among the enrolled laws, is putting on trial for official misconduct the secretary of the territory and the legislative council, in a merely collateral proceeding, in which they are not parties and are wholly unheard, and is a violation of their constitutional rights and the plainest dictates of justice."

To this argument there are two answers: 1. The secretary of the territory is not put on trial for any official misconduct, because there is nothing to show the bill was ever delivered to him; it has not been traced to his hands, and he can not keep what was never intrusted to him. 2. The defendant is bound by the facts established in this court, by the facts found by the court sitting as a jury, filed in the case as the facts found proven, and the finding not excepted to.

It is urged that the stipulation as to proof made by plaintiff can not help him in this action; that the court below could not take notice of facts brought in only by the stipulation; and yet it is only from the stipulation that the right

of the defendant to the office by appointment appears. Yet the court took notice of the facts there shown in his favor, and on them adjudged that he was rightfully entitled to the office. Why must it not take equal notice of the facts stipulated in plaintiff's favor? It was a stipulation as to mere probative facts, entirely capable of actual proof in case they really existed. If defendant thought plaintiff could not prove them, he was not obliged to admit them. He simply waived the formal proof, admitting that the facts were as claimed. He denied the conclusions which plaintiff wished to draw from them. It is not alleged, nor does it appear, that this is a feigned issue.

Let us see first what acts congress required or directed the legislature to do if it wished to pass an act over the veto of the governor, and then what acts it is proven in this case were done, so as to see whether the legislature fully complied with all the requirements or not.

Section 1842 of the revised statutes says (and I number the provisions for convenience in reference):

1. "Every bill which has passed the legislative assembly of any territory shall, before it becomes a law, be presented to the governor.

2. "If he approve it, he shall sign it;

3. "But if not, he shall return it, with his objections, to that house in which it originated,

4. "And that house shall enter the objections at large in its journal

5. "And proceed to reconsider it.

6. "If after such reconsideration two thirds of that house agree to pass the bill,

7. "It shall be sent, together with the objections, to the other house,

8. "By which it shall be likewise reconsidered,

9. "And if approved by two thirds of that house, it shall become a law;

10. "But in all such cases the vote of both houses shall be determined by yeas and nays,

11. "And the names of the persons voting for or against the bill shall be entered in the journal of each house."

Now in the matter of this bill, acted on by the legislature of the territory of Arizona, February 12, 1875, all of these

things may have been done, but in this case the record does not affirmatively show that it was proven in the trial below that all of these things were done.

1. The record does not show that the fourth requirement was complied with, viz., that the house to which the bill was returned entered the objections at large on its journal; but neither does it show that the governor stated any objections. The court found the fact on this point to be that the governor returned the bill " without his approval." I do not see that we can go beyond that finding in this respect, and presume that the governor did state objections. So far as the record goes, it does not appear that he stated any objections. I do not then see how it could be held that the omission to prove that objections of the governor were entered in the journal would affect this case, for we do not know that there were any objections to enter.

2. The seventh direction speaks of sending the objections of the governor with the bill, when the latter is sent to the house. The record here does not explicitly state that any objections of the governor were sent with the bill, but the court below found that after the bill had been passed by a two-thirds vote in the council " the said bill was, in the regular manner, transmitted to the house of representatives for its action." So far as the transmission was concerned, it seems to me that the finding of the court, if good for any purpose in this matter, shows it was sufficiently regular, particularly as it does not appear that there were any objections to transmit.

3. The eleventh direction says the yeas and nays shall be entered on the journal of each house. The record in this case does not show whether that was done or not. Was it necessary in this case for plaintiff to prove that that was done? How does the matter of proof stand? Under the pleadings in this case, what proof was necessary for the existence of this law? Plaintiff, in his complaint, alleges that he was the duly elected and qualified probate judge of Maricopa county. He alleges the election was duly held, stating the time of his election, the fact thereof, when he received his certificate, when he qualified, and when he made demand for his office. He did not plead the law under which he claimed. The defendant did not demur. He answered, and

pleaded *nul tiel record,* alleging there was no law of the territory authorizing such an election. It seems to be pretty well settled that an issue as to the existence of a public law can not be raised in that way. See numerous cases cited in *Sherman* v. *Story,* 30 Cal. 253. From that case I quote as follows: "Thus in *The Prince's Case,* 8 Co. 28, 'it was resolved that against a general act of parliament, or such act whereof the judges *ex officio* ought to take notice, the other party can not plead *nul tiel record,* for of such acts the judges ought to take notice. But if it be misrecited, the party ought to demur in law upon it, and in that case the law is grounded upon great reason; for, God forbid, if the record of such acts should be lost or consumed by fire or other means, that it should tend to the general prejudice of the commonwealth, but rather, although it be lost or consumed, the judges, either by the printed copy or by the record in which it was pleaded, or by other means, may inform themselves of it.'" See also Dwarris on Stat. 613.

Defendant says, in this case, in his brief, that the law is lost; that is, that it can not be found in the secretary's office; that the journals show it was delivered to the governor, but that he is not responsible for it. Yet the case in 8 Coke says that in such cases, God forbid that it should tend to the general prejudice of the commonwealth; that in such cases the judges, either by a printed copy or by the records, or *by other means,* may inform themselves of it. Dwarris says "the existence of a public act must be tried by the judges, who are to inform themselves in the *best way they can.*" The existence of a law is not a question to be left to a jury to determine on the accidental evidence before them. Senator Verplanck's opinion (as judge), cited in *Sherman* v. *Story,* 30 Cal. 264.

In *De Bow* v. *The People,* 1 Denio, 14, Mr. Chief Justice Bronson says the question must be settled by the court as a question of law. *Sherman* v. *Story,* 30 Cal. 268. The Supreme court of California says, in the last-cited case, that "at common law not even the plea of *nul tiel record* was admissible. There was no plea by which the existence of a general act of parliament, as a question of fact, could be put in issue and tried. It was regarded as a question of law alone, of which the judges were bound to take notice. If

the enrollment was in existence they would consult it, but of course would not go beyond that record. *But if that had been lost or destroyed,* and there was no printed statute (which I will remark is what defendant claims here), it was necessary for the judges to look for it in other documents where it had been recited or recognized and acted upon, *or to inform themselves in the best mode they could. It was still* a question of law and not of fact, and they were supposed to know the law." *Sherman* v. *Story,* 30 Cal. 259.

The legislature of Arizona have adopted the common law as the rule of decision in all courts of this territory, in all cases not in conflict with the statute law governing them. Comp. Laws, 524, sec. 7. I do not know of any statute here changing the common-law rule of pleading in this respect. I am confident there is none, and that the question of the existence of the law under which plaintiff claims was never properly raised in this case. The court found, as facts proven, that all the proceedings as to the election itself were regular—that the election was held, that plaintiff was elected, received his certificate of election, filed his bond, and took the oath required, and made demand of the office.

No question as to the existence or validity of the law under which he was elected having been properly raised, how should it have been determined? ·I think defendant misconceives the effect of the authorities he quotes from 30 California.

Statutes without some necessary penalty, either expressed or implied, are merely directory. They may be followed or not, as parties choose, for if there is no penalty, how does it matter? In the act of congress governing this case, there is no declaration of the consequences of non-compliance; to be fatal, it should have so declared, unless it can be found from the law and practice in such cases that non-compliance with all these forms is held to be fatal. I am of opinion it will be found that inquiry as to the fact of compliance or non-compliance with these requirements is not allowed, even° when the attempt is directly made to invalidate the statute because of the very fact of non-compliance.

The effect of *Spangler* v. *Jacoby,* 14 Ill. 298, is not that the party claiming the existence of a statute must show affirmatively that the yeas and nays were entered in the

journal, but that is a matter of defense that the party deny-
ing the validity of the act may prove the journals, and if
he can show from them that the vote was not entered, he
may thereby defeat the act. Even in this decision, the su-
preme court of California remark that it was decided by two
justices, the third being absent, and that the ruling was ex-
pressly based upon the very special provision of the consti-
tution of that state. *Sherman* v. *Story*, 30 Cal. 270. Even
in *Spangler* v. *Jacoby*, the court declared that if the journal
is lost or destroyed, it will be intended that the proper entry
was made on the journal. *Sherman* v. *Story*, Id. 271.

When the journal is not produced, when the defendant
does not attempt to show a non-compliance, then must it
not also be presumed by the court that either the journal is
lost and that the entry will be intended, or that defendant,
failing to produce it, and failing to undertake to show non-
entry, waives any objection on that point?

In *Pacific R. R.* v. *Governor of Missouri*, 23 Mo. 353, it
was declared that inquiry could not be made as to whether
the legislature had complied with a direction requiring par-
ticular forms to be observed in passing a bill. This was
where the rules for the action of the legislature were pre-
scribed by the constitution—certainly as binding a require-
ment as the provisions of the act of congress in this case.

The court says, to go into an inquiry as to whether all the
forms had been complied with, "would seem like an in-
quisition into the conduct of the members of the general
assembly; and it must be seen at once that it is a very deli-
cate power, the frequent exercise of which must lead to
endless confusion in the administration of the law. This
inquiry may be extended to good as well as bad laws; to
those passed as well with the approval of the governor, as
those which are passed, his objections to the contrary not-
withstanding; for it is clear that if a law passed over the
objections of the governor may be impeached by inquiry
whether the forms of the constitution were observed in its
enactment, the same inquiry may be instituted in relation to
laws passed with his sanction; and thus statutes, constitu-
tional on their face, regular in their terms, which may have
been the rule of action for years, and under which large
amounts of property have been vested and numerous titles

taken, may be abrogated and declared void." (I will remark here that every law of Arizona territory rests on this footing. See section 8, page 179, compiled laws, which requires the vote on the final passage of all bills to be by ayes and nays, and entered in the journal. Under the doctrine contended for here by defendant, the validity of every law of this territory would depend upon whether the clerk of either house had or had not possibly, in a moment of hurry, carelessness, or neglect, omitted to make a certain entry in his minutes.) The court continues: "A principle with such a consequence should be supported by a weight of authority which no court can resist. When we reflect on the manner in which journals are made up, and the rank of the officers to whom that duty is intrusted, how startling must the proposition be that all our statute laws depend, for their validity, on the journals of the two houses of the general assembly showing that all the forms required by the constitution, to be observed in their enactment, have been complied with! The required form may be observed, and the clerk may fail to make the necessary or correct entry. If the journals had been designed as the evidence in the last resort that the laws were constitutionally passed, would not some method have been adopted by which greater care would have been exacted in entering the proceedings of the two houses? Would the task of making them have been intrusted to a single clerk, with a power in the house to dispense with their reading, even should there be a rule requiring them to be read?—a matter, however, about which the constitution is silent." *Sherman* v. *Story*, 30 Cal. 272.

In *Turley* v. *County of Logan*, 17 Ill. 152, the correctness of the above decision, on general principles, was expressly admitted, but it was again claimed that the constitution of Illinois required a different rule in that state. But on this point Mr. Justice Skinner, who was not on the bench when *Spangler* v. *Jacoby*, 14 Ill. 298, was decided, expressly reserved himself, even under the constitution of Illinois. *Sherman* v. *Story*, 30 Cal. 274.

In *Sherman* v. *Story*, the supreme court of California say it is a remarkable commentary on the worthlessness of journals as evidence of the law, that out of the dozen cases cited

in that opinion, in at least two of them, if not more, it was shown that the clerks blundered in making up the journals, and adds this language: "Better, far better, that a provision should occasionally find its way into the statute through mistake, or even fraud, than that every act, state and national, should at any and all times be liable to be put in issue and impeached by the journals, loose paper of the legislature, and parol evidence. Such a state of uncertainty in the statute laws of the land would lead to mischief absolutely intolerable." *Sherman* v. *Story,* 30 Cal. 275.

What is the effect upon this case of all this law? I take it that it has this effect, that it establishes the proposition that the defendant himself, even if he were regularly at work impeaching the law, having admitted all the substantial facts concerning its passage—the original passage, the veto, the reconsideration, the two-thirds vote in each house, and the taking of the vote by ayes and nays—could not himself have introduced proof to show whether the journals contained the record of the vote or not. This, under the rule in *Sherman* v. *Story,* 30 Cal. 275, and what the court there says, is the general law. Even under the restricted rule in the case of *Spangler* v. *Jacoby,* 14 Ill. 298, on which, it is plain, much doubt is thrown by the courts of other states, as also by the new judge on the bench when that case was decided, all the defendant can claim is, that if he were regularly impeaching the validity of the act he might bring in the journals, and if the record of entry were not there, he might claim that its omission invalidated the act.

But he is not regularly impeaching the validity of the act, and if he were, it is not shown that the vote is not recorded; so he makes no point in any event. But the point that is made is by no means clear, that defendant could in any case offer proof that the record of the vote does not exist. If there had been a clear issue as to whether the act had passed, and the act itself had been produced on the trial, what proof of its passage would have been sufficient? Simply this: the certificate of the presiding officer of each house that the bill was passed by a two-thirds vote. It would not have been necessary that this certificate should state anything about record or transmission of objections, vote by ayes and nays, or record of the vote. See the attes-

tation of the passage of the civil rights bill in congress over the veto of the president, April 9, 1866. The certificate in that case proves one fact only, the substantial fact that the bill passed by a two-thirds vote. That is all the plaintiff could have been asked to establish in this case. He proved it by the admissions of the defendant. What clearer proof could he give?

As to their disposition of the bill in sending it to the governor. He is the person to whom, under the absolute veto power, they were obliged to send all bills. He received them. If he approved of them, he signed them and handed them over to the secretary for safe keeping. When the legislature found themselves suddenly in possession of a new power of legislation, they found, after the passage of the bill, that there was no legislation as to where it should be sent. This because they never had any use for such a regulation, never before having had the power to pass bills in that way. They had been in the habit of sending all their bills to the governor. It is well known that our laws are mainly copied from the laws of California. In that state the rule, after the passage of a bill over the governor's veto, is to send the bill again to the governor, who is to deposit it with the secretary of state. Defendant says the journals show that the legislature appointed a special committee to carry the bill to the governor and deposit it with him. Yet defendant says in his brief that because the legislature sent the bill to the governor in this way, they evidently did not intend that the act should become a law.

For what purpose, then, did they appoint a special committee to carry this act to the head of the executive department of the territory?

The clause in section 1842 of the revised statutes, as to passing laws over the veto of the governor, is copied from the provision in the constitution of the United States relating to passing laws over the veto of the president. I do not find any provision in the acts of congress prescribing what shall be done with a bill after it is passed over the veto of the president; but I apprehend that if the legislative department of government, in transmitting its laws to the executive department, should send a special committee to the head of the executive department, instead of to a secretary

of his department, it would not be considered as irregular, nor as invalidating the act.

There is no mode prescribed in Arizona territory for authenticating statutes passed notwithstanding the objections of the governor. Neither do I find any in the laws of the United States concerning a bill passed over the veto of the president. I find the United States statutes at large are printed without any certificate from anybody in the printed copy of laws stating that they are correct copies of the law. There is an act of August 8, 1846, declaring that a certain edition of the laws printed by Little & Brown is declared complete evidence of the laws, without any further proof or authentication thereof.

On April 9, 1866, congress passed an act on civil rights. It was vetoed by the president. It was passed over his veto. Under section 7 of article 1 of the constitution, it was required that the vote in such cases should be taken by ayes and nays, and the names of the persons voting for and against the bill should be entered on the journal of each house respectively. In the attestation of the passage of the bill over the veto, it is not stated that the constitutional provisions were complied with as to entering the veto on the journals, nor was it stated that the vote was taken by ayes and nays. The same section of the constitution requires that the objection of the president should be entered at large in the journal, yet it is not stated that this was done. Yet the proof of the mere fact of its having received the two-thirds vote is declared by congress to be sufficient to establish the law. Therefore, the plaintiff in this case could not have been required to prove compliance with the requirements as to entry of objections, nor that the vote was by ayes and nays, nor that entry thereof was made in the journal, even if the validity of the law had been regularly put in issue; much less is he required to establish it when there has been no issue raised on the subject.

The pleadings in this case did not raise the issue. It is true such does not seem to have been the understanding of the pleaders, but the question as to what issues are raised by the pleadings is to be determined by the established rules of pleading, and not by the understanding or intent of the pleader.

The court has no power to submit this question to be tried by a jury as an ordinary question of fact. Section 153 of our compiled laws says issues are of two kinds, of law and of fact. Section 154 says an issue of law arises by demurrer;· it can not then be raised by an answer. Section 156: An issue of law shall be tried by the court, unless it be referred upon consent, as provided in this chapter. The matter as to reference is settled in the section on pages 413 and 414, compiled laws. The trial of an issue of law may be referred. The parties must *agree* to the reference, and their agreement be filed, or entered in the minutes. The reference shall not consist of more than three persons. The existence or non-existence of the statute in this case was a question of law. It was tried by the court sitting as a jury. Properly it could be tried *only by the court or by a reference* agreed upon by the parties. Therefore, the whole matter of trying it by a jury in the ordinary way was irregular, even if the issue had been raised on the pleadings. *A multo fortiori* was it error when there was no such question raised?

It is seen here how easily this issue could have been fully tried. If the existence of the statute were denied, and the issue properly raised as one of law, it could have been tried by the court or by a reference of three persons. The court or the referees would, as Dwarris says, have informed themselves on the matter in the best way they could, and have determined the matter accordingly. But even if this mode would have been adopted, the conclusion of law from the admitted facts of the case was error.

The substantial facts, viz., the intention of the bill, original passage, veto, and subsequent passage by a two-thirds vote, were all proved, and that was sufficient to prove the existence of the statute.

To say that because the act itself can not be found in the secretary's office it can not therefore be proved in any way, is to say that the will of the people, solemnly enacted in the form of law, may be entirely defeated by any one who chooses to abstract the roll of the statute from the secretary's office; but I call attention again to the language quoted in *Sherman* v. *Story*, 30 Cal. 275: God forbid that the will of the people should be thwarted in that way. If such a case arises, the authorities are that the judges will inform

themselves of the existence of the statute and its contents, as Dwarris says, in the best way they can.

The cases cited in 30 California, and relied upon by defendant, are where parties undertook to contradict the actual official record of the law, but in this case there was no attempt to contradict a record; it was claimed the act was lost, and the effort was simply to prove what the record contained. The issue was not raised on the pleadings, but the plaintiff voluntarily furnished proofs of all the essentials of the statute, the substantial facts of its passage and what it contained. Clearly, under all the rules, he was entitled to do this, even when fairly put on proofs. He furnished the strongest, most indubitable proof, the admission of the defendant himself, reduced to writing and filed in the case. He therefore proved the existence of the statute.

A statute is the will of the people, just as a certain document may be the will of a deceased person. But neither the paper nor the writing thereon, in either case, constitutes the *will* spoken of. The words are but the symbols used to convey the will of others, to show what the will is. The contents of a lost will may be proven. So may the contents of a lost statute. The fact of loss, it may be said, must be first established. Not necessarily. That is a ground of objection to the evidence, but if the objection is not made, and the evidence is admitted, it stands. No objection was made in this case; on the contrary, the fact of loss was set up by the defendant himself, and he there admitted the contents of the instrument and its execution; that is, in this case, certain facts as to its execution, which facts in law are sufficient to establish its execution.

The decision in this case does not extend beyond the parties. It does not bind the people in any other case. If another case arises, the question can be raised again. The decision of the supreme court is the law only of the case in which it is rendered. If the defendant here has admitted more than can be proven in another case, or than could have been proven in this case, it is his own affair. Each case stands on its own merits.

It is true, parties can not stipulate that, as a matter of fact, a certain law exists. Neither can they deny that it exists as

a fact, because the existence or non-existence of a statute is not a question of fact, but a question of law.

The parties in this case did not stipulate as to what the law was; that is the very thing the defendant would not admit—that this law did exist.  He was willing to admit certain things were done; whether because he was satisfied they could easily be proven, or because he knew himself what they were in fact, does not matter.

He admitted the facts, but he denied utterly that therefore there was a law.  But these facts which he admitted show that the law does exist.

I am therefore of opinion:

1. That on the whole of the twelfth of February, 1875, and up to the eighteenth day of that month, the legislature of the territory of Arizona had power to pass laws notwithstanding the objections of the governor.

2. That the existence of the law authorizing the election held in this case was not called in question in this case, nor its effect and purpose, as claimed by plaintiff.

3. That nevertheless, though not required to do so, plaintiff showed facts sufficient to establish the existence of the statute and its contents, sufficient to govern this case.

4. That he showed a right to the office under the law.

5. That therefore the decision of the court below, denying his right to the office, should be reversed.